# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michael Pittman,

        Plaintiff,

v.

Lucinda Jesson,
*in their individual and official capacities*,

Cal Ludeman,
*Each in their individual capacities and in their*
*official capacities as employees of the Department of*
*Human Services*,

Dennis Benson,
*Each in their individual capacities and in their*
*official capacities as employees of the Department of*
*Human Services*,

Greg Carlson,
*Each in their individual capacities and in their*
*official capacities as employees of the Department of*
*Human Services*,

Kevin Moser,
*in their individual and official capacities*,

Tom Lundquist,
*Each in their individual capacities and in their*
*official capacities as employees of the Department of*
*Human Services*,

Liz Barbo,
*Each in their individual capacities and in their*
*official capacities as employees of the Department of*
*Human Services*,

Tara Osborne,
*Each in their individual capacities and in their*
*official capacities as employees of the Department of*
*Human Services*,

Case No. 12-cv-1410 (SRN/TNL)

**REPORT &**
**RECOMMENDATION**

1

Rob Rose,
*in their individual and official capacities*,

Nancy Johnston,
*in their individual and official capacities*,

Terry Kneisel,
*in their individual and official capacities*,

Brian Ninneman,
*in their individual and official capacities*,

Thomas Snedker,
*in their individual and official capacities*,

Robert Bender,
*in their individual and official capacities*,

Justin Wright,
*in their individual and official capacities*,

Tom Cherro,
*in their individual and official capacities*,

Janelle Luczak,
*in their individual and official capacities*,

Jeanne Dreher,
*in their individual and official capacities*,

Jessica Ranem,
*in their individual and official capacities*,

Mike Anderson,
*in their individual and official capacities*, and

Amanda Furey,
*in their individual and official capacities*,

Defendants.

---

Daniel E. Gustafson and Raina Borrelli, Gustafson Gluek PLLC, 120 South Sixth Street, Suite 2600, Minneapolis, MN  55402 (for Plaintiff); and

Steven H. Alpert, Assistant Attorney General, Minnesota Attorney General's Office, 445
Minnesota Street, Suite 1100, St. Paul, MN 55101-2128 (for Defendants Jesson, Moser, Rose,
Johnston, Kneisel, Ninneman, Snedker, Bender, Wright, Cherro, Luczak, Dreher, Ranem,
Anderson, and Furey).

---

# I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on
Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 15).[1]   This
motion has been referred to the undersigned magistrate judge for a report and recommendation to
the district court, the Honorable Susan Richard Nelson, District Judge of the United States
District Court for the District of Minnesota, under 28 U.S.C. § 636 and Local Rule 72.2(b).

A hearing was held.  Raina Borrelli appeared on behalf of Plaintiff.  (ECF No. 23.)
Steven Alpert appeared on behalf of Defendants (*Id.*)

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY
RECOMMENDED** that Defendants' Motion to Dismiss Plaintiff's First Amended Complaint
(ECF No. 15) be **GRANTED IN PART** and **DENIED IN PART**.

# II. BACKGROUND[2]

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for violations of his civil rights
based on claims of racial discrimination and infringement of his religious freedom.

## A.  Parties

Plaintiff has been civilly committed to the Minnesota Sex Offender Program ("MSOP")
and currently resides in the Moose Lake, Minnesota facility.  (Am. Compl. ¶ 4.)  Plaintiff is an

---

[1] Plaintiff filed an Amended Complaint on October 17, 2013.  (ECF No. 10.)  Defendants Ludeman, Benson,
Carlson, Lundquist, Barbo, and Osborne were not named in the Amended Complaint and have been terminated from
this action.  The instant motion to dismiss is brought on behalf of all remaining Defendants.

[2] "In analyzing a motion to dismiss, a court must accept the allegations contained in the complaint as true and make
all reasonable inferences in favor of the nonmoving party."  *Martin v. Iowa*, 752 F.3d 725, 726 (8th Cir. 2014); *see
also Rasmusson v. Chisago Cnty.*, No. 12-cv-0632 (SRN/JSM), ___ F. Supp. 2d ____, 2014 WL 107067, at *2 (D.
Minn. Jan. 10, 2014) ("When evaluating a motion to dismiss, the Court assumes the facts in the Complaint to be true
and construes all reasonable inferences from those facts in the light most favorable to Plaintiff.").

African American and a practicing Muslim.  (*Id.* ¶ 23.)  Defendant Jesson is the Commissioner of the Minnesota Department of Human Services ("DHS"), the state agency responsible for MSOP.  (*Id.* ¶ 5.)  Defendants Johnston, Moser, Kneisel, Ninneman, and Rose hold various upper-level administration and supervisory positions within MSOP.  (*Id.* ¶¶ 6-10.)  Defendants Snedker, Bender, Wright, Cherro, Luczak, Dreher, Ranem, Anderson, and Furey are security counselors with MSOP.  (*Id.* ¶¶ 11-19.)

### B.  Racial Discrimination

Plaintiff alleges that he has been the subject of racial discrimination from MSOP staff since his commitment in December 2010.  (*Id.* ¶¶ 22, 25.)  Such discrimination has been perpetrated through comments by MSOP staff and patients and unequal treatment of Caucasian and African American patients.

#### 1.  Derogatory Comments

In July 2012, Plaintiff was involved in an altercation with Defendants Bender, Wright, Cherro, Luczak, Dreher, and Ranem.  (*Id.* ¶ 25.)  Following this incident, Plaintiff alleges that "[t]hese Security Counselors made statements about Plaintiff such as, 'I hate that nigger,' 'I wish he was dead,' and 'If I get my hands on that nigger, I'm going to kill him.'"  (*Id.*)  Plaintiff alleges that such statements have caused him to fear for his safety.  (*Id.*)  "Additionally, Plaintiff has been told by other MSOP patients that these MSOP Security Counselors refer to [him] as a 'nigger' after he walks by them in the facility."  (*Id.*)  Plaintiff also alleges that "these Security Counselors use the words 'monkey' and 'ape' towards him as well."  (*Id.*)

In February 2013, an unknown MSOP security counselor said to Plaintiff, "'What up snicker.'"  (*Id.* ¶ 26.)  "Plaintiff understood the word 'snicker' to have been used in place of the word 'nigger.'"  (*Id.*)  Defendant Snedker "overheard the statement and tried to convince

Plaintiff that it was not meant as a racial slur." (*Id.*)  Plaintiff alleges that Defendant Snedker did not, however, ask the unknown MSOP security counselor "to explain himself, apologize, or address the statement in any way." (*Id.*)  Plaintiff subsequently discussed this incident with Defendant Kneisel, "who told Plaintiff that he would not discuss the issue with his staff and that staff does not have to offer Plaintiff an explanation or apology for using the word 'snicker.'" (*Id.*)  Plaintiff also filed a client request form with Defendant Ninneman, "asking why patients are allowed to use discriminatory language without consequences.  Defendant Ninneman responded that the issues are always addressed by the client's unit director." (*Id.* ¶ 34.)

The same month, "Plaintiff overheard another MSOP patient . . . use the word 'nigger' repeatedly." (*Id.* ¶ 33.)  Plaintiff filed a client request with MSOP regarding the incident. (*Id.*)  Defendant Ninneman responded to Plaintiff's client request, saying that "all reports of racial remarks are taken seriously and followed up on." (*Id.*)  Approximately one month later, Plaintiff overheard the same patient again using the word "nigger" repeatedly. (*Id.*)  Plaintiff reported the incident to MSOP staff and filed another client request. (*Id.*)  "The response to his client request form says that the issue was addressed by staff." (*Id.*)

"MSOP's Behavioral Expectations Handbook, which lays out the . . . disciplinary process for rule violations," prohibits "the use of derogatory or profane words and name calling." (*Id.* ¶ 35.)

### 2.  Unequal Treatment

Plaintiff also alleges that he "has repeatedly been reprimanded or punished by MSOP staff for behavior that goes ignored when performed by [Caucasian] patients." (*Id.* ¶ 27; *see also id.* ¶¶ 28, 30, 31.)

5

Plaintiff filed a client request with Defendant Rose in September 2011 after observing that MSOP security counselors "allowed [Caucasian] patients to congregate in a group and talk with each other while on the unit but did not allow [African American] patients to do the same." (*Id.* ¶ 31.)

Plaintiff alleges that Caucasian patients are not reprimanded for horseplay. (*Id.* ¶ 27.) Plaintiff alleges that he was reprimanded by Defendant Anderson in March 2012 for engaging in horseplay with another African American patient. (*Id.*) Later that day, Plaintiff observed two Caucasian patients engaging in horseplay in front of Defendants Anderson and Furey and these Caucasian patients were not reprimanded for their actions. (*Id.*)

Plaintiff also alleges that, in March 2012, he received a "Behavioral Expectation Report" ("BER"), a form of discipline at MSOP, for "wearing a hat out of his unit." (*Id.* ¶ 30; *see also id.* ¶ 28.) The same day, Plaintiff "observed [Caucasian] patients wearing hats out of their units before going outdoors and none of them received any reprimands or a BER." (*Id.* ¶ 30.) Plaintiff "submitted a client request regarding this incident to Defendant . . . Rose, . . . who responded that all patients are held to the same standards." (*Id.*)

Additionally, Plaintiff alleges that he "is followed and observed more closely by staff than [Caucasian] patients." (*Id.* ¶ 32.) Plaintiff alleges that "Defendant Luczak followed [him] as he moved around his living unit" one day in mid-January 2013. (*Id.*)

### 3. Administrative Process

Plaintiff alleges that he "has addressed his concerns [related to racial discrimination] through the administrative process available . . . . He has filed a number of grievances and client requests with the MSOP staff . . . and the MSOP, particularly Defendants Ninneman and Rose, repeatedly assures him that they take the issue of racial discrimination seriously." (*Id.* ¶ 36.)

Plaintiff alleges, however, that "nothing has changed in the three years that [he] has been committed to the MSOP and he continues to hear racial slurs directed at him from MSOP staff and other MSOP patients." (*Id.*)

Plaintiff also alleges that he has raised the issue of racial discrimination to "the MSOP's Hospital Review Board ('HRB'), which is a three[-]member panel created by statute to hear MSOP patient grievances and concerns." (*Id.*)   Plaintiff alleges that "[t]he HRB did not recommend that MSOP make any changes to their policy or do any follow-up investigation of Plaintiff's claims of racial discrimination." (*Id.*)

Similarly, Plaintiff alleges that Defendants Johnston and Moser have been made aware of racial discrimination perpetrated by MSOP staff and patients through Plaintiff's numerous complaints. (*Id.*)   Plaintiff alleges that Defendants Johnston and Moser "have not reprimanded the MSOP staff involved or implemented any policy changes to stop the discrimination." (*Id.*)

### 4.  Reports

Plaintiff alleges that "institutional racism" has been brought to MSOP's attention a number of times. (*Id.* ¶ 37.)   Plaintiff states that, in 2005, "the HRB recommended that the MSOP increase diversity and improve the racial awareness and sensitivity of its staff, adjust programming for various minority groups, and implement a zero-tolerance policy for discriminatory or harassing conduct." (*Id.*)   Additionally, "in 2005, the Minnesota Ombudsman for Mental Health and Mental Retardation noted that the MSOP lacked diversity training and cultural diversity." (*Id.*)

Plaintiff also points to a 2006 report commissioned by MSOP to review and evaluate "the MSOP's issues relating to diversity and racism." (*Id.* ¶ 38.)  The report "found that the MSOP had a culture of racism and discrimination and recommended that the MSOP work to correct that

problem by increasing staff diversity, instituting policies that promote diversity, and seek outside accreditation." (*Id.*)

Plaintiff alleges that, notwithstanding these recommendations, "the MSOP has not changed its attitudes or polices with respect to discrimination." (*Id.* ¶ 39.)

### C.  Infringements on Religious Freedom

#### 1.  MSOP's Spiritual Practices & Dress Code Policies

MSOP has a Spiritual Practices policy, 302.300, which provides that "'Facilities will promote an atmosphere free from coercion, harassment, or ridicule due to spiritual affiliation.'" (*Id.* ¶ 40.)  Further, the policy provides that "patients may only wear or use personal religious items in their rooms and during scheduled religious services, ceremonies, and meetings." (*Id.* ¶ 41.)  The policy also states that "[u]se of religious items in public areas must be approved by the Religious Services Coordinator and the unit team." (*Id.*)

MSOP also has a Client Hygiene/Dress Code policy, which, among other things, covers headwear. (*Id.*)  "[H]eadwear . . . is defined as '[h]ats, bandanas, scarves, headbands, hoods, do-rags[,] and shower caps." (*Id.*)  The policy provides that headwear "may only be worn in a patient's assigned room, in the yard, and for approved religious practices." (*Id.*)

"These MSOP polices are created and implemented by Defendants Jesson, Johnston[,] and Moser in their capacity as the upper-level administration of MSOP." (*Id.*; *see also id.* ¶ 47.)

#### 2.  Kufi

As state above, Plaintiff is a practicing Muslim. (*Id.* ¶¶ 23, 40.)  "As part of his religious practice, [Plaintiff] wears a Kufi, which is a head covering that Muslim men wear as a symbol of humility at all times and to identify his religious affiliation." (*Id.* ¶ 40.)  "Plaintiff's sincerely held religious beliefs mandate that the Kufi be worn at all times." (*Id.*)

Plaintiff alleges that these polices "prohibit [him] from wearing his Kufi at all times, which prohibits him from fully practicing his religious beliefs." (*Id.* ¶ 41.) "Plaintiff has been prohibited from wearing his Kufi except for when he is inside his cell and during Jumah services, which are held from 12:30-1:30 pm on Fridays. He is not allowed to wear his Kufi when walking to and from his religious studies or services." (*Id.* ¶ 40.) "Plaintiff has received multiple [BERs] as a result of wearing his Kufi outside of his room." (*Id.* ¶ 42; *see also id.* ¶ 43.) "Plaintiff has observed . . . [Defendant] Dreher . . . checking to see if [African American] patients are wearing a Kufi as they leave the buildings[ as t]hey are not supposed to wear the Kufi until they are outside." (*Id.* ¶ 44.)

Plaintiff alleges that "MSOP staff continues to tell [him] that he may not wear his 'hat' unless he is in his cell or outside. Plaintiff has repeatedly told the MSOP that the Kufi is not a 'hat['] it is a Muslim head covering that he wears pursuant to his religious beliefs." (*Id.* ¶ 45.)

### 3.  Other Religious Items

Plaintiff also alleges that he "is not allowed to bring his Koran out to the yard area of the MSOP facility where he lives, he cannot wear his prayer beads at all times, and he cannot do his daily prayers in the MSOP yard area." (*Id.* ¶ 46.) In addition, Plaintiff alleges that he "is not allowed to have his praying oils in his room." (*Id.*) Plaintiff alleges that "[t]hese are all significant aspects of Plaintiff's religious beliefs and practices and he is being restricted from fully practicing his Muslim religion." (*Id.*)

### D.  Harm Suffered

As a result of the above racial discrimination and infringements on Plaintiff's religious beliefs, Plaintiff

> has suffered injury and damages including high blood pressure, surgery to repair torn stomach lining on Feb. 18, 2013[,] that was

the result of stress, needing to participate in anger and
assertiveness training from March through June of 2013 to deal
with the emotions that this discrimination has caused him to have,
and trouble sleeping.

(*Id.* ¶ 48.)

### E.  Litigation

Plaintiff filed an Amended Complaint on October 17, 2013.[3]   (Am. Compl.)   Plaintiff
brings two claims pursuant to 42 U.S.C. § 1983.   First, Plaintiff contends that all Defendants
have engaged in racial discrimination in violation of the equal protection clause of the Fourteenth
Amendment.   (Am. Compl. ¶¶ 49-55.)   Second, Plaintiff contends that Defendants Jesson,
Johnston, and Moser have violated his right to exercise his religion freely under the First and
Fourteenth Amendments by implementing policies and procedures that restrict his religious
freedom and are "not related to a legitimate institutional or therapeutic interest."[4]   (*Id.* ¶¶ 56-64.)

### III. MOTION TO DIMISS

Defendants move to dismiss Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P.
12(b)(6).   Defendant also moves to dismiss those portions of Plaintiff's claims for money
damages against Defendants in their official capacities pursuant to Fed. R. Civ. P. 12(b)(1),
asserting that claims for money damages are barred by Eleventh Amendment and, therefore, the
Court lacks subject matter jurisdiction.

---

[3] For a period of time, this matter was stayed pending proceedings in *Karsjens et al. v. Jesson et al.*, Case No. 11-cv-
3659 (DWF/JJK).   (Am. Compl. ¶ 2; Amended Order, June 19, 2012, ECF No. 3.)   The stay was lifted on June 7,
2013.   (Am. Compl. ¶ 3; Order Lifting Stay, June 7, 2013, ECF No. 6.)

[4] While the caption of Count II states that Plaintiff is also bringing his free exercise claim pursuant to "Article I of
the Minnesota Constitution" and his prayer for relief refers to "state constitutional, statutory, and common law
claims," (Am. Compl.), no such claims are clearly pleaded in the Amended Complaint and Plaintiff confirms in his
memorandum in opposition that he "does not allege any state constitutional or state common law claims," (Pl.'s
Opp'n at 2 n.1, ECF No. 20.)

### A.  Eleventh Amendment

The Eleventh Amendment effectively "immunizes from suit a 'state agency or official if immunity will protect the state treasury from liability that would have had essentially the same practical consequence as a judgment against the State itself.'"  *King v. Dingle*, No. 08-cv-5922 (ADM/RLE), 702 F. Supp.2d 1049, 1068 (D. Minn. March 11, 2010) (quoting *Hadley v. N. Ark. Cmty. Tech. Coll.*, 76 F.3d 1437, 1438 (8th Cir. 1996) (internal quotation omitted)).  "Thus, the Eleventh Amendment bars actions, in Federal Court, which seek monetary damages from individual State Officers, in their official capacities, . . . for the recovery of money from the state."  *Id.* at 1069 (quotation omitted).

In the Amended Complaint, Plaintiff seeks to "recover actual and/or nominal damages, as provided by law," against Defendants.  (Am. Compl. ¶ e.)  Defendants contend that such damages are barred by the Eleventh Amendment because "Congress did not abrogate, and the Minnesota Legislature has not waived, Minnesota's Eleventh Amendment immunity concerning legal claims raised by Plaintiff."  (Defs.' Mem. in Supp. at 14.)   In his memorandum in opposition, Plaintiff states that he "does not seek monetary damages from Defendants in their official capacities."  (Pl.'s Mem. in Opp'n at 26 n.7.)  Plaintiff contends that this argument is therefore moot.  (*Id.*)

It is not clear from the Amended Complaint that any monetary damages are not being sought from Defendants in their official capacities.  Therefore, in the interests of clarity, "to the extent Plaintiff[] may seek any such monetary damages against Defendants in their official capacities, the Court agrees that monetary damages are not recoverable."  *Karsjens v. Jesson*, No. 11-cv-3659 (DWF/JJK), ___ F. Supp.2d ____, 2014 WL 667971, at *16 (D. Minn. Feb. 20, 2014); *accord Hodgson v. Fabian*, No. 08-cv-5120 (JNE/SRN), 2009 WL 2972862, at *6 (D.

Minn. Sept. 10, 2009) ("It is well-settled that in a 42 U.S.C. § 1983 action, the Eleventh Amendment precludes an award of money damages against a state official acting in his or her official capacity.   A plaintiff may maintain an action against a government official if the complaint seeks only injunctive or prospective relief." (citations omitted)), *aff'd*, 378 Fed. App'x 592 (8th Cir. 2010).

### B.  Legal Standard on a Motion Dismiss

"To withstand a Rule 12(b)(6) motion, a complaint must contain sufficient factual allegations to 'state a claim to relief that is plausible on its face.'" *Smithrud v. City of St. Paul*, 746 F.3d. 391, 397 (8th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  "[A]lthough a complaint need not contain 'detailed factual allegations,' it must contain facts with enough specificity 'to raise a right to relief above the speculative level.'" *United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.").   "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678.  Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). "In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences most favorably to the complainant." *Raynor*, 690 F.3d at 955.

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "the court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).  The court may, however, "consider some materials that are part of the public record or do not contradict the complaint as well as materials that are necessarily embraced by the pleadings." *Id.* (quotations and citation omitted); *see also Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) ("In addressing a motion to dismiss, the court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." (quotation omitted)).  "[D]ocuments 'necessarily embraced by the complaint' are not matters outside the pleading." *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004).  "[T]he court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion." *Stahl v. United States Dep't of Agric.*, 327 F.3d 697, 701 (8th Cir. 2003) (quotation omitted).  Defendants have submitted copies of the policies referred to in the Amended Complaint, MSOP's Client Behavioral Expectations Handbook, and three BERS issued to Plaintiff.  (*See generally* Aff. of Steven H. Alpert, ECF No. 18.)  Plaintiff does not object to their inclusion in the record before the Court.  These materials are embraced by the Amended Complaint and the Court has considered them in its analysis.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must show that he was deprived of a right secured by the Constitution and the laws of the United States and that the deprivation was committed by a person acting under color of state law." *Alexander v. Hedback*, 718 F.3d 762, 765 (8th Cir. 2013); *see also* 42 U.S.C. § 1983.  Plaintiff must plead sufficient facts showing each Defendant's personal involvement in or direct responsibility for the alleged deprivation. *See Stewart v. Baker*, 360 Fed. App'x 696, 697 (8th Cir. 2010); *Ellis v. Norris*, 179 F.3d 1078,

1079 (8th Cir. 1999); *accord Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) ("To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights.").  "In requiring a plaintiff to allege that each defendant was personally involved in the deprivation of his constitutional rights, [the Court] assess[es] each defendant relative to his authority over the claimed constitutional violation." *Jackson*, 474 F.3d at 543.

> While the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor may still be liable under § 1983 if either his direct action or his failure to properly supervise and train the offending employee caused the constitutional violation at issue. Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in creating, applying, or interpreting a policy that gives rise to unconstitutional conditions.

*Id.* (quotations and citations omitted).

Further,

> [c]laims under § 1983 may be made against a defendant in either an individual or official capacity. Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent.

*Hester v. Redwood Cnty.*, No. 11-cv-1690 (ADM/JJK), 885 F. Supp.2d 934, 943 (D. Minn. 2012) (quotations and citations omitted).  To succeed on an official-capacity claim, Plaintiff "must show that  a constitutional violation was committed pursuant to an official policy or custom and that such policy or custom was the moving force behind [P]laintiff's injury." *Burlison v. Springfield Pub. Schs.*, 708 F.3d 1034, 1041 (8th Cir. 2013) (quotations omitted).

14

### C.  Equal Protection Claim/Racial Discrimination

"'The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race.'"  *Foster v. Wyrick*, 823 F.2d 218, 220 (8th Cir. 1987) (quoting *Washington v. Davis*, 426 U.S. 229, 239 (1976)).  "To state an equal protection claim, [Plaintiff] must have established that he was treated differently from others similarly situated to him."  *Johnson v. City of Minneapolis*, 152 F.3d 859, 862 (8th Cir. 1998); *accord Karsjens*, 2014 WL 667971, at *10 ("To state an actionable equal protection claim, Plaintiffs must allege facts to show that they have been treated differently from similarly situated individuals.").

> To establish a violation of equal protection based on selective enforcement, a plaintiff must ordinarily show that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Advantage Media L.L.C. v. City of Hopkins*, No. 04-cv-4959 (MJD/JGL), 379 F. Supp.2d 1030, 1045-46 (D. Minn. July 29, 2005) (quotation omitted).

Defendants contend that Plaintiff has not alleged sufficient facts to show their personal involvement in the alleged racial discrimination and the acts identified do not otherwise state an actionable equal-protection claim.  For ease of analysis, the Court will separate Defendants into groups by their alleged conduct.

### 1.  Jesson, Johnston & Moser

Defendants Jesson, Johnston, and Moser hold upper-level administration positions. Defendant Jesson is the Commissioner of DHS.  (Am. Compl. ¶ 5.)  In this position, Minnesota law requires Defendant Jesson to "adopt rules to govern the operation, maintenance, and

licensure of secure treatment facilities operated by [MSOP]."  Minn. Stat. § 246B.04, subd. 1.

Defendant Johnston is the Executive Director of MSOP.  (Am. Compl. ¶ 6.)  According to

Minnesota law, the Executive Director is "the person who is charged with overall responsibility

for the operation of [MSOP], or the person's designee."  Minn. Stat. § 246B.01, subd. 2c.

Defendant Moser is the Director of MSOP.  (Am. Compl. ¶ 7.)  Plaintiff alleges that these three

individuals, in their individual and official capacities, "implemented, retained[,] and carried out

policies through MSOP that violated the constitutional rights of Plaintiff."  (*Id.* ¶¶ 5, 6, 7.)

Additionally, Plaintiff alleges that "[d]ue to Plaintiff's numerous complaints regarding racial

discrimination by MSOP staff and other MSOP patients, Defendants . . . Johnston and . . . Moser

have been made aware of the issue, yet they have not reprimanded the MSOP staff involved or

implemented any policy changes to stop the discrimination."  (*Id.* ¶ 36; *see also id.* ¶ 54.)

Defendants argue that Plaintiff has "ma[de] the same 'catchall' allegation against each

Defendant" and "general responsibility for supervising the operation of MSOP is not sufficient to

establish personal liability."  (Defs.' Mem. in Supp. at 16, 18, 23, ECF No. 17.)  With respect to

Defendant Jesson, Defendants argue that Plaintiff "asserts simply that she 'created and

implemented' MSOP policies. . . . [and t]his allegation is insufficient to state a viable claim

because [Plaintiff] does not allege any direct improper conduct or a failure to properly train or

supervise subordinates against Jesson herself."  (*Id.* at 16-17.)  Defendants argue that Plaintiff's

allegations against Defendants Johnston and Moser similarly fail because, although "[Plaintiff]

alleges that they have been aware of his complaints and 'yet they have not reprimanded the

MSOP staff involved or implemented any policy changes to stop the discrimination[,] . . . . these

allegations fail to implicate Johnston and Moser in any direct wrongful conduct or a failure to

train or supervise a subordinate in connection with any alleged discriminatory conduct."  (*Id.* at

16

17.)   Defendants also argue that Plaintiff's own allegations "contradict any wrongdoing," pointing to MSOP policies that prohibit the use of derogatory or profane language and name calling, and that MSOP follows up on reports of racial remarks.  (*Id.*; *see also* Defs.' Reply at 4, ECF No. 22.)  According to Defendants, Plaintiff's "claim is that these high[-]level supervisors instituted departmental policies.  But if there was any violation of [Plaintiff's] constitutional rights, it is not based upon policies and procedures that, unless violated by staff, are designed to treat [Plaintiff], and all others at MSOP, equally and with respect."  (Defs.' Mem. in Supp. at 23.)

Plaintiff responds that he "need only plead that Defendants were directly involved in policy decisions which created the unconstitutional conditions."  (Pl.'s Opp'n at 13.)  Plaintiff asserts that "Defendants Jesson, Johnston, and Moser all have the authority to create and implement policies, . . . [and] these policies, as implemented, resulted in racial discrimination directed at Plaintiff."  (*Id.* at 14.)  Plaintiff references the report finding "MSOP had a culture of racism" and asserts that these Defendants "have not changed policies with respect to the complained of discrimination."  (*Id.* at 14.)  Further, Plaintiff asserts that "Defendant Jesson may be responsible for her own failure to act" based on her statutory duties.  (*Id.*)  As for Defendants Johnston and Moser, Plaintiff asserts that their personal involvement is based on their supervisory capacity and that "each had personal knowledge of the discrimination [through Plaintiff's numerous complaints] but failed to remediate the unconstitutional conduct."  (*Id.* at 15.)

Recently, in *Jackson v. Nixon*, the Eighth Circuit examined the sufficiency of § 1983 allegations made against individuals "by virtue of their positions within the prison system."  747 F.3d 537, 544 (8th Cir. 2014).  The Eighth Circuit noted that

> [t]he authority of the state [department of corrections] director to make prison-wide policy decisions may be sufficient to give rise to liability under § 1983.   We have found a [department of corrections] director may be "responsible for his own failure to act," based on his statutory duty to administer the Department of Corrections and "supervise the administration of all institutions, facilities and services under the Department's jurisdiction" and his authority to change the challenged policies.

*Id.* (quoting *Messimer v. Lockhart*, 702 F.2d 729, 732 (8th Cir. 1983)).

With respect to the state director of corrections, the plaintiff alleged that the director knew or should have known about policy changes and how they affected inmates under the director's jurisdiction.  *Id.*  The Eighth Circuit observed that Missouri law required the director of corrections to supervise, manage, and control the department of corrections, including supervising employees and implementing policies, procedures, rules, and regulations.  *Id.*  Such rules included rules regarding programs, particularly whether an inmate would be admitted into or removed from the challenged program.  *Id.* at 544-45.  "Given [the director's] statutory duties, including those associated with administration of the [challenged program]," the Eighth Circuit concluded that the complaint pleaded sufficient allegations of the director's personal involvement.  *Id.* at 545.

As for the prison's warden, the plaintiff similarly alleged that the warden knew or should have known about "'Constitutional matters'" in the facility and, if the warden had taken action, the plaintiff may have remained in the program.  *Id.* at 544.  Noting that "the warden's general supervisory authority over prison operations does not make him liable under § 1983," the Eighth Circuit stated that the complaint must "plead facts to show that [the warden] was directly involved in making, implementing, or enforcing a policy decision that created unconstitutional conditions."  *Id.* at 545 (quotation omitted).   While recognizing that the plaintiff was "challeng[ing] the curriculum of a treatment program[,] . . . which was inherently a policy

decision," the Eighth Circuit concluded that these knew-or-should-have-known allegations were insufficient because they did not "plead facts that plausibly show direct involvement by the warden in the formation, implementation, or enforcement of that policy." *Id.*

The Eighth Circuit also considered the allegations made against the director of the treatment program at the prison. *Id.* at 544, 545. The complaint alleged that the treatment program director "suggested ways for [the plaintiff] to remain in the religious program that might conflict less with his atheism" and that, as the program's director, the director could have excused the plaintiff from certain aspects of the program. *Id.* at 544; *see also id.* at 545. Despite the fact that "[t]he scope of [the treatment program director's] authority as to the [program] curriculum and inmates' participation in it [was] unclear," the Eighth Circuit found that there were sufficient allegations of the treatment program director's personal involvement because the § 1983 claim "concerns her ability to help ameliorate the constitutional violation alleged." *Id.* at 545 (citing *Lomholt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002) (per curiam)).

In light of the Eighth Circuit's holding in *Jackson*, the Court concludes that Plaintiff has sufficiently alleged the personal involvement of Defendant Jesson. Defendant Jesson is statutorily bound to adopt rules governing the operation of MSOP. *See Jackson*, 747 F.3d at 544, 545. Although the Amended Complaint itself recognizes that there are policies in place prohibiting the type of conduct complained of by Plaintiff, Defendant Jesson's statutory duty to oversee MSOP may make her liable if these policies are being carried out in such a way as to create unconstitutional conditions. *See Messimer*, 702 F.2d at 732 (warden may be liable for failure to act where inmates were complaining of practice that violated "administrative regulations" and warden had statutory duty to administer department of corrections and supervise administration of all institutions, facilities, and services). Plaintiff also alleges that Defendant

Jesson implemented the policies in question.  *See Martin v. Sergeant*, 780 F.2d 1334, 1338 (8th Cir. 1985) ("In order to survive a motion to dismiss, a prisoner need not plead more than that the warden was directly involved in the decision.").

Plaintiff has not alleged that Defendant Jesson had "any knowledge or connection with these incidents."  *Id.* at 1337 (allegation that warden should be liable for racial slurs used by prison staff "by virtue of his supervisory position" was "predicated on a *respondeat superior* theory which does not apply in § 1983 suits for damages").  In *Messimer*, however, the Eighth Circuit noted that it had previously held that "a sheriff who had a statutory duty to supervise a jail was liable for jail conditions even though he may not have actual knowledge of them."  702 F.2d at 732 (quotation omitted).  Given Defendant Jesson's statutory duties with respect to MSOP, the Court concludes that Plaintiff has sufficiently alleged her personal involvement.  *See Jackson*, 747 F.3d at 544, 545; *Messimer*, 702 F.2d at 732.

The Court likewise concludes that Plaintiff has sufficiently alleged the personal involvement of Defendants Johnston and Moser.  Defendant Johnston is similarly charged by statute with overseeing MSOP.  *See Jackson*, 747 F.3d at 544, 545.  Further, as Executive Director, Defendant Johnston is charged with "establish[ing] a grievance policy and related procedures that address and attempt to resolve civilly committed sex offender concerns and complaints," which "must include procedures for assessing or investigating a civilly committed sex offender's concerns or complaints."  Minn. Stat. § 246B.03, subd. 3(a).

Additionally, Plaintiff has alleged that Defendants Johnston and Moser were aware of the ongoing racial discrimination based on Plaintiff's numerous complaints, yet, despite having the power, did nothing to stop the discrimination.  *See Lomholt*, 287 F.3d at 684 (allegation that defendant refused to help when prisoner informed defendant of alleged unconstitutional conduct

perpetrated by others sufficient to state § 1983 claim); *Nelson v. Stuart*, No. 11-cv-3143 (DSD/TNL) (Report & Recomm. at 7-8, Aug. 23, 2012, Docket No. 31) (prisoner's allegations that he made complaints to sheriff regarding medical treatment sufficient to state a deliberate-indifference claim under § 1983), *adopting report and recommendation*, (Order, Nov. 20, 2012, ECF No. 36).

Moreover,

> a supervisor may be held individually liable under § 1983 if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights. The plaintiff must demonstrate that the supervisor was deliberately indifferent to or tactility authorized the offending acts.

*Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (citation omitted); *see also Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995) ("The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what he or she might see." (quotation omitted)). Plaintiff has pleaded facts showing that Defendants Johnston and Moser were aware of racially charged comments made by MSOP staff yet took no action to correct staff behavior, suggesting such behavior was tacitly authorized by MSOP administration. The Court concludes that Plaintiff has plausibly alleged that Defendants Johnston and Moser, in their supervisory capacities, knew of and were in a position to remediate the alleged racial discrimination, but did not do so.

### 2. Ninneman & Rose

Plaintiff's allegations against Defendants Ninneman and Rose involve four client requests he submitted, two to Defendant Rose and two to Defendant Ninneman. (Am. Compl. ¶¶ 30, 31, 33, 34, *see also id.* ¶ 36.) Both of the client requests to Defendant Rose describe instances of unequal treatment of Caucasian and African American patients. (*Id.* ¶¶ 30, 31.) The Amended

Complaint only contains Defendant Rose's response to one of them, wherein he states that "all patients are held to the same standards." (*Id.* ¶ 30.) The client requests to Defendant Ninneman involve instances of discriminatory language. (*Id.* ¶¶ 33, 34.) In his responses, Defendant Ninneman stated that "all reports of racial remarks are taken seriously and followed up on" and "the[se] issues are always addressed by the client's unit director." (*Id.* ¶¶ 33, 34.) Like Defendants Jesson, Johnston, and Moser, Plaintiff also alleges that Defendants Ninneman and Rose, in their individual and official capacities, "implemented, retained[,] and carried out policies and practices through the MSOP that violated the constitutional rights of Plaintiff." (*Id.* ¶¶ 9, 10.)

According to Defendants, Plaintiff's "assertions against Defendants Ninneman and Rose are in essence that he did not like the response he received to his grievances or received no response at all." (Defs.' Mem. in Supp. at 21.) Defendants argue that Plaintiff "does not have a constitutional right to a grievance procedure." (*Id.*) Defendants also argue that Plaintiff has failed to plead facts showing that these defendants "w[ere] personally involved in conduct that is severe enough to amount to unconstitutional racial discrimination." (Defs.' Reply at 3.)

Plaintiff responds that "the allegations as to Defendants Ninneman and Rose are not based on Plaintiff's right to a grievance procedure or Plaintiff's dissatisfaction with responses to his grievances. They are based on the fact that Defendants Ninneman and Rose have condoned discriminatory conduct by failing to act to remedy the conduct." (Pl.'s Opp'n at 17.) Plaintiff asserts that "Defendants . . . Ninneman [and] Rose . . . were directly involved in discriminatory actions based on their knowledge of and participation in the alleged discrimination." (*Id.* at 16.)

First, there are no allegations that Defendants Ninneman and Rose directly participated in any of the alleged racially motivated conduct. Second, the content of the client requests that

Plaintiff submitted is significant.  In all but one request, Plaintiff talked only generally of conduct he had observed without naming specific employees who engaged in the discriminatory conduct.  (*See* Am. Compl. ¶¶ 30, 31, 34.)  The more specific client request involved the repeated use of the word "nigger" by another MSOP patient.  (*Id.* ¶ 33.)  Defendant Ninneman responded that "all reports of racial remarks are taken seriously."  (*Id.*)  Indeed, Defendant Ninneman and Rose's responses evidence collectively the seriousness in which they viewed allegations of racially motivated conducted.  *See Braden*, 588 F.3d at 597 ("An inference pressed by the plaintiff is not plausible if the facts he points to are precisely the result one would expect from lawful conduct in which the defendant is known to have engaged.").  Third, without diminishing the seriousness of Plaintiff's allegations as a whole, Plaintiff have not alleged facts showing that Defendants Ninneman and Rose were aware of a pervasive problem of racial discrimination like Defendants Johnston and Moser.  *See Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007) ("Telling admittedly noisy inmates to 'shut up' on one occasion did not violate the Fourteenth Amendment, even if equally noisy inmates of another race were not equally chastised."); *Sargent v. Kemna*, 133 Fed. App'x 355 (8th Cir. 2005) ("few individual examples of unequal treatment are insufficient to provide more than minimal support for inference of purposeful discrimination" (citing *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998))).

Based on the foregoing, the Court concludes that Plaintiff has not pleaded facts showing Defendants Ninneman and Rose's personal involvement in the alleged racial discrimination and has failed to state a § 1983 claim against these Defendants.  Accordingly, the Court recommends that Defendants' motion be granted with respect to Defendants Ninneman and Rose.

### 3.  Bender, Wright, Cherro, Luczak, Dreher & Ranem

Plaintiff alleges that he got into an altercation with Defendants Bender, Wright, Cherro, Luczak, Dreher, and Ranem in July 2012, after which these Defendants "ma[de] statements about Plaintiff such as, 'I hate that nigger,' I wish he was dead,' and 'If I get my hands on that nigger, I'm going to kill him." (Am. Compl. ¶ 25.)  Plaintiff further alleges that he "has been told by other MSOP patients that these [Defendants] refer to Plaintiff as 'nigger' after he walks by them in the facility[ and] Plaintiff has heard these [Defendants] use the words 'monkey' and 'ape' towards him as well." (*Id.*)  Plaintiff also alleges that on one occasion Defendant Luczak "followed Plaintiff as he moved around his living unit." (*Id.* ¶ 32.)

Defendants argue that Plaintiff "lumps all of these defendants together and fails to assert which of these defendants have made which statements and whether these statements were actually made to [Plaintiff and] . . . has thus failed to allege facts sufficient to implicate the discriminatory intent of each Defendant." (Defs.' Mem. in Supp. at 18; *see also* Defs.' Reply at 5-6.)  Defendants also assert that, "while non-physical harassment of prisoners is obviously inappropriate and unprofessional, such conduct will, not by itself, support a federal civil rights claim."[5] (Defs.' Mem. in Supp. at 18; *id.* at 24 ("[T]aunting does not violate the federal constitution."); *see also id.* at; Defs.' Reply at 6.)

---

[5] The Court assumes that Defendants' reference to "prisoners" was simply an inadvertent typographical error and is perhaps attributable to the fact that the first citation Defendants supply in support of this proposition is a case involving a prisoner. (Defs.' Mem. in Supp. at 18 (citing *Martin*, 780 F.2d 1334 (§ 1983 litigation over alleged violations of the Eighth Amendment).)  This term, however, is particularly sensitive in the context of civil confinement and MSOP. *See, e.g.*, *Karsjens*, 2014 WL 667971, at *7 ("At the center of Plaintiffs' challenge to the Minnesota sex offender commitment scheme is the allegation that a commitment to MSOP essentially amounts to lifelong commitment, equivalent to a lifetime of criminal incarceration in facility resembling, and run like, a medium to high security prison."), *12 ("While the Eighth Circuit has determined that the liberty interests of individuals committed to state custody as dangerous persons 'are considerably less than those held by members of free society,' the Eighth Circuit has also acknowledged that such individuals are 'entitled to more considerate treatment and conditions of confinement' than prison inmates." (quoting *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006))).  The Court recognizes that prisoner cases can often be instructive given that both civil commitment and incarceration each involve custodial environments with similar safety concerns. *See Serna v. Goodno*, 567 F.3d 944, 953 (8th Cir. 2009) (noting that "security at detention facilities, prisons, and mental

Plaintiff contends that "each [of the Defendants] made discriminatory statements about Plaintiff,"; each of "these Defendants refer to Plaintiff as a 'nigger' after he walks by them"; and "each uses the words 'monkey' and 'ape' towards him as well."  (Pl.'s Opp'n at 17.)  Plaintiff contends that the pleaded facts "indicate that the Defendants directly participated in the complained of conduct with a discriminatory purpose and intent."  (*Id.* at 17-18.)

Generally, "[v]erbal threats are not constitutional violations cognizable under § 1983." *Martin*, 780 F.2d at 1338; *accord Hopson v. Frederickson*, 961 F.2d 1374, 1378 (8th Cir. 1992) ("Generally, mere verbal threats made by a state-actor do not constitute a § 1983 claim."); *Burton v. Livingston*, 791 F.2d 97, 99 (8th Cir. 1986) ("[I]n the usual case[,] mere words, without more, do not invade a federally protected right.").  This includes "even the use of reprehensible racially derogatory language" by individuals having custody of another.  *Lewis*, 486 F.3d at 1028; *accord Blades v. Schuetzle*, 302 F.3d 801, 805 (8th Cir. 2002).  When the racially derogatory language is "pervasive or severe enough to amount to racial harassment," however, it can rise to the level of a Fourteenth Amendment violation.  *Blades*, 302 F.3d at 805; *accord Lewis*, 486 F.3d at 1028.

Case law indicates that there is something of a continuum along which unprofessional racially charged conduct of the type alleged in this case can be placed.  At the far end is *Burton*, wherein a prison guard pointed his firearm at Burton, cocked it and stated "nigger run so I can blow your Goddamn brains out, I want you to run so I'll be justified."  791 F.2d at 99.  Later that day, the same prison guard again pointed his firearm at Burton and said "nigger run, I want you to run."  (*Id.*)  These threats took place while Burton was being transported from the courthouse

---

institutions alike, is undoubtedly important" and "[t]he governmental interests in running a state mental hospital are similar in material aspects to that of running a prison" (quotation omitted)); *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004) ("Although an involuntarily committed patient of a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner.").

where Burton "was in attendance . . . for a hearing on a complaint against guards" at the prison. *Id.* at 98, 99. The district court dismissed Burton's complaint for failure to state a claim based on the proposition that threatening language does not amount to a constitutional violation. *Id.* at 99. The Eighth Circuit reversed, finding that the alleged facts stated "a claim under the First Amendment as well as under the Due Process and Equal Protection Clauses of the Fourteenth Amendment." *Id.* at 101 n.2, 101. Particularly significant to the Eighth Circuit's decision was the fact that the racially derogatory language was accompanied by a death threat. *Id.* at 100. The Eighth Circuit "h[eld] that a prisoner retains at least the right to be free from the terror of instant and unexpected death at the whim of his allegedly bigoted custodians." *Id.*

At the other end are situations like what occurred in *Lewis*. Lewis worked in the prison's garment factory. 486 F.3d at 1027. Lewis alleged that his supervisor "violated his Fourteenth Amendment right to equal protection . . . by telling black inmates but not white inmates to 'shut up and quit laughing.'" *Id.* at 1028. The Eighth Circuit observed that "Lewis was not injured, he was not disciplined, and he was not transferred to another prison job or facility." *Id.* The Eighth Circuit held that "[t]elling admittedly noisy inmates to 'shut up' on one occasion did not violate the Fourteenth Amendment, even if equally noisy inmates of another race were not equally chastised." *Id.*

In between fall cases like *Blades* and *Hopson*. In *Blades*, a prison guard "ridiculed the color of [Blades's] palms and told him to smile so that he could be seen in the dark." 302 F.3d at 805. Notwithstanding the fact that "these words are thoroughly offensive, and it is particularly reprehensible for a government official to utter them in the course of his duties," the Eighth Circuit held that the statements were not actionable under the Fourteenth Amendment. *Id.*; *see also Graves v. North Dakota State Penitentiary*, 325 F. Supp.2d 1009, 1011-12 (D. N.D. 2004)

(showing of racially derogatory drawing to prisoner by prison guard was offensive and reprehensible but did not amount to unconstitutional racial discrimination).

Hopson was placed in the backseat of a police car and, when he refused to answer the officers' questions, one of the officers "turned to Hopson, uttered a racial slur, and threatened to 'knock [Hopson's] remaining teeth out of his mouth' if he remained silent." *Hopson*, 961 F.2d at 1378 (alternation in original). Distinguishing Hopson's circumstances from *Burton*, the Eighth Circuit noted that the officer "never threatened to kill Hopson" and "never brandished a lethal weapon." *Id.* at 1378, 1379. Further, "nowhere has Hopson either alleged that he was physically assaulted by [the officer] or that [the officer] raised his fists or made any type of physical gesture toward him." *Id.* at 1379. The Eighth Circuit concluded that "no reasonable juror could find that Hopson's allegations constitute a cognizable constitutional claim under § 1983." *Id.*

Plaintiff's allegations against Defendants Bender, Wright, Cherro, Luczak, Dreher, and Ranem most closely resemble *Hopson* in that the racially derogatory language was accompanied by a threat of violence. But, although not as egregious or shocking as the threats made in *Burton*, Plaintiff has alleged that some of the remarks were accompanied by death threats. This fact is not lost on the Court. *See Hopson*, 961 F.2d at 1378. Defendants are correct that Plaintiff does not specifically identity which of these Defendants made which comment. But in the context of a motion to dismiss, it is assumed that one or more of these Defendants made death threats against Plaintiff and each Defendant, as Plaintiff alleges, used the words "nigger," "monkey," and "ape." The Court concludes that, when viewed as a whole, Plaintiff has pleaded sufficient facts to state a claim for unconstitutional racial discrimination based on (1) the pervasiveness of the conduct as reflected in the number of MSOP employees involved and (2)

the severity of the statements.  *See Braden*, 588 F.3d at 594; *Lewis*, 486 F.3d at 1028; *Blades*, 302 F.3d at 805.

### 4.   Snedker & Kneisel

Plaintiff's allegations against Defendants Snedker and Kneisel derive from their response to an incident in which an unknown MSOP security counselor stated to Plaintiff, "What up snicker."  (Am. Compl. ¶ 26.)  "Plaintiff understood the word 'snicker' to have been used in place of the word 'nigger.'"  (*Id.*)  Defendant Snedker, also a MSOP security counselor, "overheard the statement and tried to convince Plaintiff that it was not meant as a racial slur." (*Id.*)  Plaintiff alleges that Defendant Snedker "did not ask the [unknown] Security Counselor to explain himself, apologize, or address the statement in any way."  (*Id.*)  Plaintiff alleges that he later "discussed this incident with MSOP Program Manager Defendant . . . Kneisel, who told Plaintiff that he would not discuss the issue with his staff and that staff does not have to offer Plaintiff an explanation or apology for using the word 'snicker.'"  (*Id.*)  Additionally, Plaintiff alleges that Defendants Snedker and Kneisel, in their individual and official capacities, "implemented, retained[,] and carried out policies and practices through the MSOP that violated the constitutional rights of Plaintiff."  (*Id.* ¶¶ 8, 11.)

Defendants contend that Plaintiff's "allegation of unprofessional conduct by an unidentified MSOP employee fails to state an actionable claim against [Defendants] Snedker and Kneisel" and that Plaintiff has not sufficiently alleged the personal involvement of these Defendants.  (Defs.' Mem. in Supp. at 19; *see also* Defs.' Reply at 2-3.)  Defendants contend that "[s]uch one-time comments or acts are wholly insufficient to demonstrate a discriminatory racial purpose."  (Defs.' Mem. in Supp. at 26.)  Plaintiff counters that "Defendants Kneisel . . . [and] Snedker . . . were directly involved in the discriminatory actions based on their knowledge of and

participation in the alleged racial discrimination."  (Pl.'s Opp'n at 16.)  Plaintiff alleges that these Defendants "were aware of, but ignored, the racial slur . . . that was directed at Plaintiff" and "[t]his is sufficient to demonstrate discriminatory purpose."  (*Id.*)

Viewing this particular incident in isolation, it most closely resembles *Blades* above, wherein the Eighth Circuit concluded that Blades had not pleaded a Fourteenth Amendment claim for racial discrimination "because the offensive statements did not rise to an actionable level."  302 F.3d at 805.  But, when evaluating whether a complaint states a claim, the Eighth Circuit has instructed that each allegation cannot be viewed in isolation and, therefore, the Court must consider this incident in light of its conclusion that the racially derogatory and racially charged statements of MSOP staff were so pervasive and severe as to state a Fourteenth Amendment claim for racial discrimination.  *See Braden*, 588 F.3d at 594.

Construing all reasonable inferences in favor of Plaintiff, including that the unknown security counselor's use of the term "snicker" was intended as a racial slur, the Court concludes that Plaintiff has failed to state a claim against Defendant Snedker.  Plaintiff alleges that Defendant Snedker did not ask the unknown security counselor "to explain himself, apologize, or address the statement in any way."  (Am. Compl. ¶ 26.)  But the Amendment Complaint contains no facts showing that Defendant Snedker was in a position to make demands of a fellow security counselor.  Plaintiff has not alleged that Defendant Snedker occupied any sort of supervisory position.  Defendant Snedker "tried to convince Plaintiff that [the statement] was not meant as a racial slur," (Am. Compl. ¶ 26), but Plaintiff has not alleged facts from which it could be reasonably inferred that Defendant Snedker condoned the statement or prevented Plaintiff from seeking further redress.  Indeed, Plaintiff reported the statement to Defendant Kneisel.  The only reasonable inference to be drawn from the facts alleged is that Defendant Snedker was

attempting to ameliorate a strained situation brought on by a fellow employee's unprofessional and offensive conduct.  Plaintiff has not plausibly alleged the personal involvement of Defendant Snedker in any discriminatory conduct.

With respect to Defendant Kneisel, however, the Court concludes that Plaintiff has alleged sufficient personal involvement of Defendant Kneisel based on his alleged authority over the offending security counselor.  Plaintiff alleges that Defendant Kneisel told him that he would not discuss the incident with "his staff" and no explanation or apology was required for use of the term "snicker."  (*Id.*)  Plaintiff alleges that MSOP has a policy which prohibits "the use of derogatory or profane words and name calling."  (*Id.* ¶ 35.)  Viewing the Amended Complaint as a whole and construing all reasonable inferences in favor of Plaintiff, Plaintiff has alleged sufficient facts that Defendant Kneisel occupied a position of authority over the offending security counselor, chose not to take corrective action, and that such inaction was tacit acceptance of the racially derogatory language and part of a larger pattern of pervasive racial discrimination at MSOP.

Accordingly, the Court recommends that Defendants' motion be granted in part with respect to Defendant Snedker but denied as to Defendant Kneisel.

### 5.  Anderson & Furey

Turning to Defendants Anderson and Furey, Plaintiff alleges that he was "reprimanded" by Defendant Anderson for engaging in horseplay and, later that same day, "he observed two white patients engaging in horseplay in front of . . . Defendant[s] Anderson and . . . Furey and the white patients were not reprimanded."  (Am. Compl. ¶ 27.)  As with the preceding Defendants, Plaintiff also alleges that Defendants Anderson and Furey, in their individual and

official capacities, "implemented, retained[,] and carried out policies and practices through the MSOP that violated the constitutional rights of Plaintiff." (*Id.* ¶¶ 18, 19.)

Defendants argue that, "[w]hile [Plaintiff] alleges that the improper conduct he was admittedly engaged in was similarly situated to the conduct of the two white patients who were not reprimanded, he does not allege facts that Defendant Anderson acted with intent and purpose to reprimand him based on racial animus." (Defs.' Mem. in Supp. at 20.) Defendants also argue that Plaintiff has alleged only that Defendant Furey was "present when no one was reprimanded." (Defs.' Reply at 2.) Similar to Defendants Ninneman, Rose, Snedker, and Kneisel, Plaintiff responds that "Defendants . . . Anderson[]and Furey were directly involved in the discriminatory actions based on their knowledge of and participation in the alleged racial discrimination" and these Defendants "refused to reprimand similarly situated white patients in the same manner as black patients." (Pl.'s Opp'n at 16.)

By itself, this incident most closely approximates what occurred in *Lewis*. Just as "telling admittedly noisy inmates to 'shut up' on one occasion d[oes] not violate the Fourteenth Amendment, even if equally noisy inmates of another race [are] not equally chastised," 486 F.3d at 1028, reprimanding one group of MSOP patients for admittedly engaging in horseplay on one occasion while another group of MSOP patients is not reprimanded for engaging in similar conduct does not violate the Fourteenth Amendment. Again, however, this Court is required to consider this incident in the broader context of the Amended Complaint as a whole. *See Braden*, 588 F.3d at 594.

When an equal protection claim is based on alleged racial discrimination, the plaintiff "must show that he was treated differently *because of* his race." *Ahmed v. Fenesis*, No. 05-cv-

2388 (JRT/FLN), 2007 WL 2746842, at *11 (D. Minn. Sept. 19, 2007).   Given MSOP's custodial environment, the Court finds the following passage from *Ahmed* instructive:

> In a prison setting, it is inevitable that inmates will be disciplined by different prison officials for different misconduct, and that different discipline will be meted out in different matters.   It is therefore inevitable that some inmates will complain that they have been sanctioned more harshly than other inmates who committed different, but allegedly comparable, infractions.   In the absence of some evidence of illegal discrimination, complaints about different discipline are not actionable under § 1983.

*Id.*   The same could be said about MSOP security counselors; different security counselors may have different concepts of horseplay and the level of rambunctiousness required in order to warrant a reprimand.   Unlike Defendant Anderson, Defendant Furey is not alleged to have been involved in reprimanding Plaintiff for horseplay.   It may be that the behavior observed by Defendant Furey did not constitute horseplay or did not warrant a reprimand in her mind.

Taking the Amended Complaint as a whole, however, especially the pervasive use of racially derogatory language, it can be reasonably inferred that Defendants Anderson and Furey did not discipline the Caucasian patients because of their race.   Plaintiff alleges that Defendant Anderson disciplined him, an African American, for engaging in horseplay while Caucasian patients were not reprimanded for the same conduct.   Defendants Anderson and Furey are charged with enforcing the rules of MSOP and the facts alleged show that Plaintiff was treated differently because of his race.   Therefore, the Court recommends that Defendants' motion be denied with respect to Defendants Anderson and Furey.

### D.  Free Exercise Claim[6]

#### 1.  Statement of a Claim

Plaintiff alleges that MSOP's Spiritual Practices policy infringes upon the free exercise of his religion by restricting the places in which he may wear his Kufi; Plaintiff has received multiple BERs on account of MSOP deeming the Kufi to be a "hat" under MSOP's Client Hygiene/Dress Code policy; and Plaintiff has observed Defendant Dreher checking to see if African American patients are wearing a Kufi prior to exiting the building as "[t]hey are not supposed to wear the Kufi until they are outside."  (Am. Compl. ¶¶ 40-45.)  Plaintiff also alleges that he is not allowed to bring his Koran into the yard area, is not permitted to wear his prayer beads at all times, is unable to do his daily prayers in the yard, and is prohibited from having praying oils in his room.  (Id. ¶ 46.)  Plaintiff alleges that MSOP's Spiritual Practices and Client Hygiene/Dress Code policies "severely restrict [his] religious beliefs and practices" and that these policies were "created and implemented by Defendants Jesson, Johnston[,] and Moser in their capacity as the upper-level administration of the MSOP."  (Id. ¶¶ 47, 41.)  Plaintiff brings this claim against Defendants Jesson, Johnston, and Moser in their individual and official capacities.  (Id. ¶¶ 5-7.)

Defendants argue that Plaintiff's free-exercise claim should be analyzed under a modified version of the guidelines set forth in *Turner v. Safley*, 482 U.S. 78, 85 (1985), modifications which recognize that civilly committed individuals are entitled to more considerate treatment and conditions of confinement and account for the treatment/therapeutic objectives of civil commitment while also recognizing the institutional interests in play.  (Defs.' Mem. in Supp. at

---

[6] While Defendants have made arguments responding to a perceived procedural due process claim concerning the BER process, (Defs.' Mem. in Supp. at 32-34), Plaintiff clarified in his opposition memorandum that he "is not asserting a procedural due process claim in this case relating to Defendants' BER process.  Instead, Plaintiff alleges a substantive due process claim due to Defendants' infringement on Plaintiff's fundamental liberty right to First Amendment freedom of religion." (Pl.'s Opp'n at 18 n.5.)

27-28.)  *See, e.g., Karsjens*, 2014 WL 667971, at *11 ("consider[ing] each of Plaintiffs' First Amendment claims in light of appropriate therapeutic interests as well as relevant safety and security concerns"); *Semler v. Ludeman*, No. 09-cv-0732 (ADM/SRN), 2010 WL 145275, at *8 (D. Minn. Jan. 8, 2010) ("In *Ivey*, this Court applied a version of the test set forth in *Turner v. Safley*, 482 U.S. 78, (1978) (formulating a standard of review for prisoners' constitutional claims), moderated to account for principles stated in *Senty–Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (addressing the rights of civilly committed persons), to a First Amendment claim brought by a civilly committed sex offender." (citing *Ivey v. Mooney*, No. 05-cv-2666 (JRT/FLN), 2008 WL 4527792 at *5-7 (D. Minn. Sept. 30, 2008))); *Ivey*, 2008 WL 4527792, at *10 ("The Court will proceed to analyze Plaintiff's First Amendment claim . . . under the *Turner* analysis with the Eighth Circuit's holding in *Senty-Haugen* as a guide.  Since Plaintiff is a civilly committed patient at the MSOP, there are no legitimate penological interest[s], instead the Court will consider legitimate therapeutic interests.").  *But see Beaulieu v. Ludeman*, 690 F.3d 1017, 1039 (8th Cir. 2012) (applying *Turner* to challenged MSOP polices where "both parties agree that the *Turner* test applies").

Defendants assert that "MSOP policies do not prohibit [Plaintiff] outright from wearing his Kufi.  Rather, the policies impose reasonable restrictions . . . based on safety and security concerns."  (Defs.' Mem. in Supp. at 31; *see also* Defs.' Reply at 7.)  Additionally, Defendants assert that Plaintiff's "right to religious freedom is not violated by the requirement that his bead necklace must be worn inside the clothing when outside his room or that possession of scented oils is limited."  (Defs.' Mem. in Supp. at 31-32.)  Citing the language of the policies, Defendants assert that the polices were established to promote a safe, therapeutic environment and allow all of MSOP's clients a reasonable opportunity to pursue their individual beliefs.

(Defs.' Reply at 7-8.)  Defendants point to numerous decisions from the Eighth Circuit Court of Appeals, this District, and other courts upholding policy restrictions on religious items and activities in the prison setting.  (Defs.' Mem. in Supp. at 29-31.)  Defendants assert that MSOP's "policies impose reasonable restrictions based on safety and security concerns."  (*Id.* at 31.)

Plaintiff recognizes that "[c]ourts in this district have found that although involuntarily committed persons may have their First Amendment rights restricted, any such restrictions must be reasonably related to legitimate therapeutic or institutional interests."  (Pl.'s Opp'n at 20 (quotation omitted).)   Plaintiff contends, however, that Defendants must show that MSOP's policies are "narrowly tailored to the purpose for which Plaintiff[ is] committed because of the fundamental liberty interests implicated."[7]  (*Id.* at 19; *see also id.* at 21.)  "Plaintiff disputes that *Turner* should apply here, even as modified by *Ivey*, because Plaintiff is not a prisoner.  Instead, the Court should determine whether the infringement on Plaintiff's First Amendment rights is narrowly tailored to meet a compelling state interest."  (*Id.* at 21.)  Nevertheless, "under either the more stringent test for limitations on fundamental liberty rights or the *Turner* standard," Plaintiff contends he has alleged sufficient facts to state a claim for the infringement of his religious freedom.  (*Id.*)

Plaintiff states that he has alleged sufficient facts to support his claim that Defendants Jesson, Johnston, and Moser interfered with his right to exercise freely his religion "by implementing punitive policies, procedures, and practices that prohibit Plaintiff from wearing his Kufi, as required by his sincerely held religious beliefs. . . . [and] prohibit Plaintiff from keeping

---

[7] Interestingly, in the Amended Complaint, Plaintiff alleged that "[c]ivilly committed persons may be subjected to liberty restrictions *reasonably related* to legitimate government objectives that are not tantamount to punishment as determined by reasonable professional judgment."  (Am. Compl. ¶ 58 (emphasis added); *see also id.* ¶ 59 ("Policies or restrictions of First Amendment rights must be reasonably related to legitimate institutional and therapeutic interests.").)

his prayer oils in his room, wearing his prayer beads, bringing his Koran to the yard, and doing

his prayers in the yard." (Pl.'s Opp'n at 18-19.)  Moreover, Plaintiff states that Defendants

> do not provide any explanation of what therapeutic benefits arise
> from the limitations or what safety and security concerns are
> implicated.  Defendants also provide no justification, safety and
> security or otherwise, for limitations on Plaintiff wearing his
> prayer beads, use of prayer oils in his room, or practicing his
> religion in the yard.

(*Id.* at 23 (citation omitted); *see also id.* at 25.)  Plaintiff also states that the cases cited by

Defendants are inapposite "because they each considered religious freedom in a prison setting,

not a therapeutic civil commitment setting like the MSOP." (*Id.* at 24.)

At this stage, the Court need not determine under which standard—*Turner*, modified

*Turner*, or something else—MSOP's policies will be evaluated. *See Karsjens*, 2014 WL 667971,

at *11 ("While the court need not conclusively resolve the issue of the precise, applicable

standard today, the Court considers each of Plaintiff's First Amendment claims in light of

appropriate therapeutic interests as well as relevant safety and security concerns.").  The issue

before the Court is whether Plaintiff has stated a claim for infringement of his religious freedom

under the First Amendment, as made applicable through the Fourteenth Amendment.  Plaintiff

certainly retains those First Amendment rights not inconsistent with MSOP's therapeutic

interests or institutional safety concerns. *See id.* at *13 ("Plaintiffs no doubt retain, at minimum,

those First Amendment rights that are not inconsistent with legitimate security concerns."); *Ivey*,

2008 WL 4527792, at *4 (noting conflict between First Amendment right sought to be exercised

and MSOP's rehabilitation efforts); *see also Rogers v. Scurr*, 676 F.2d 1211, 1216 (8th Cir.

1982) ("'Inmates retain those First Amendment rights not inconsistent with their status as

prisoners or with penological objectives of the corrections system." (quoting *Pell v. Procunier*,

417 U.S. 817, 822 (1974))).

"[A] person claiming that a governmental policy or action violates his right to exercise his religion freely must establish that the action substantially burdens his sincerely held religious belief." *Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997); *see also Karsjens*, 2014 WL 667971, at *12 ("In order to succeed on a claim asserted under the Free Exercise Clause of the First Amendment, Plaintiffs must ultimately establish that the challenged regulations place a 'substantial burden' on Plaintiffs' ability to practice their religions.").

> To substantially burden one's free exercise of religion, a regulation must: (1) "significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs"; (2) "meaningfully curtain a person's ability to express adherence to his or her faith"; or (3) "deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion."

*Karsjens*, 2014 WL 667971, at *12 (quoting *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008)); *see also Brooks v. Roy*, 12-cv-316 (SRN/JSM), 881 F. Supp.2d 1034, 1052 (D. Minn. 2012) (same).

Construing all reasonable inferences in favor of Plaintiff for purposes of this motion, the Court concludes that Plaintiff has plausibly alleged that Defendants Jesson, Johnston, and Moser have substantially burdened Plaintiff's right to exercise his religion freely. Plaintiff has alleged facts that he is not able to engage in certain religious activities and possess certain religious items in a manner consistent with his beliefs as a result of policies, practices, and procedures of Defendants Jesson, Johnston, and Moser. Defendants Jesson and Johnston are charged under Minnesota law with overseeing the operation of MSOP. *See Jackson*, 747 F.3d at 544 ("Moreover, an allegation that the [department of corrections] director authorized an unconstitutional policy may be sufficient to state a claim for actions allegedly taken directly by the director." (quotation omitted)). Plaintiff alleges that "[t]hese policies, procedures[,] and

practices are not related to a legitimate institutional or therapeutic interest of the Defendants."
(Am. Compl. ¶ 62.)  Lastly, Plaintiff alleges that the actions of Defendants Jesson, Johnston, and
Moser "unreasonabl[y] restrict[]" his ability to practice his religion.  (*Id.* ¶ 63.)  *See Karsjens*,
2014 WL 667971, at *12 ("conclud[ing] that Plaintiffs have raised a plausible free exercise
claim, regardless of whether the *Turner* standard or a modified *Turner* standard applies").

Based on the foregoing, the Court recommends that Defendants' motion be denied with
respect to the stating of a free exercise claim against Defendants Jesson, Johnston, and Moser
under the First and Fourteenth Amendments.

### 2.   Qualified Immunity

There remains, however, one additional aspect to address regarding Plaintiff's free
exercise claim.  Defendants contend that, should this Court determine that Plaintiff has stated a
claim against Defendants Jesson, Johnston, and Moser for violating Plaintiff's right to freely
exercise his religion, Plaintiff's claim still fails because these Defendants are protected by
qualified immunity.[8]  (Defs.' Mem. in Supp. at 35.)  Defendants again point to the number of
cases involving prisoners with complaints similar to Plaintiff's which have upheld restrictions
like those present in MSOP's policies and the analogous nature of civil commitment to the prison
setting.  (Defs.' Reply at 8.)  Moreover, Defendants contend that Plaintiff

> fails to point to any clearly established federal law that supports his
> demand for an unlimited right to practice his religion.  Even if it
> should turn out that this Court determines that the restrictions at
> MSOP somehow violate [Plaintiff's] religious rights, at most, this

---

[8] The Court notes that it is somewhat unclear whether Defendants are claiming qualified immunity with respect to
both Plaintiff's equal protection claim and his free exercise claim or just his free exercise claim.  (*See* Defs.' Mem.
in Supp. at 35.)  The relevant heading in Defendants' supporting memorandum refers only to Plaintiff's religious
infringement allegations.  (*Id.*)  Defendants then put forth a cursory argument in their supporting memorandum,
referring at times to Defendants Jesson, Johnston, and Moser, but also mentioning Defendants Snedker, Kneisel,
Anderson, Furey, Rose, and Ninneman.  (*Id.* at 36.)  In Defendants' reply, however, Defendants argue qualified
immunity only with respect to Plaintiff's free excise claim and Defendants Jesson, Johnston, and Moser.  (*See* Defs.'
Reply at 2, 8-9.)

> would be based on a mistaken judgment, and not an intentional
> violation of [Plaintiff's] constitutional rights.

(*Id.* at 8.)

Plaintiff counters that qualified immunity is not applicable because Plaintiff has alleged facts showing that Defendants Jesson, Johnston, and Moser have violated Plaintiff's clearly established First and Fourteenth Amendment rights.  (Pl.'s Opp'n at 26.)

"Under the doctrine of qualified immunity, a court must dismiss a complaint against a government official in his individual capacity that fails to state a claim for violation of 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Mitchell v. Shearrer*, 729 F.3d 1070, 1074 (8th Cir. 2013) (same).  When qualified immunity is raised in a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "[a] court considers whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right and whether the right was clearly established at the time of the alleged infraction."  *Hager*, 735 F.3d at 1013; *see also Bradford v. Huckabee*, 330 F.3d 1038, 1040 (8th Cir. 2003) (same).  "Qualified immunity is an affirmative defense, to be upheld in a motion to dismiss only when the immunity can be established on the face of the complaint." *Bradford*, 330 F.3d at 1041 (citing *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir.1996)).

"A right is clearly established if its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right'" *Mitchell*, 729 F.3d at 1076 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "[T]he question [of] whether the right was clearly established at the time the defendant acted requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident." *Janis v. Biesheuvel*, 428 F.3d 795, 799 (8th Cir. 2005) (quotation omitted).  Moreover, qualified

immunity must be analyzed "in light of the specific context of the case, not as a broad general proposition." *Williams v. Jackson*, 600 F.3d 1007, 1013 (8th Cir. 2010) (quotation omitted); *see also Smith v. City of Minneapolis*, No. 13-1157, ___ F.3d ____, 2014 WL 2535298, at *3 (8th Cir. June 6, 2014) (cautioning against defining established law "'at a high level of generality'" (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011)). Officials "cannot escape suit merely because no prior case involved exactly the same facts." *Williams*, 600 F.3d at 1013; *accord Smith*, 2014 WL 2535298, at *3 ("'We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" (quoting *al-Kidd*, 131 S. Ct. at 2083)). "In other words, the rights as set forth in the holdings of existing cases are clearly established not only as to the facts of the prior cases, but also as applied in contexts that reasonable [officials] would understand to fall within the scope of those rights." *Williams*, 600 F.3d at 1013. As the Eighth Circuit "ha[s] often stated[,] . . . officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* (quotation omitted).

Plaintiff asserts that cases involving prisoners are inapposite because they do not consider the exercise of religious freedom in a therapeutic setting. Although the Eighth Circuit has recognized that civilly committed persons are "entitled to more considerate treatment and conditions of confinement" than prisoners, *Senty-Haugen*, 462 F.3d at 886 (quotation omitted), the Eighth Circuit has also emphasized that the liberty interests of civilly committed persons are considerably less and must be understood in the context of their commitment, *id.*; *Beaulieu*, 690 F.3d at 1028. Further, the Eighth Circuit has recognized that the institutional safety concerns between prisons and secure treatment facilities like MSOP are largely analogous. *Beaulieu*, 690 F.3d at 1028; *Serna*, 567 F.3d at 953; *Revels*, 382 F.3d at 874; *Morgan v. Rabun*, 128 F.3d 694,

40

697 (8th Cir. 1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison.  Administrators have a vital interest in ensuring the safety of their staff, other patients, and of course in ensuring the patients' own safety."). Accordingly, the Court concludes that cases involving prisoners with allegations similar to Plaintiff's are instructive in determining whether the allegedly infringed rights were clearly established.  *See Banks v. Ludeman*, No. 08-cv-5792 (MJD/JJK), 2010 WL 4822892, at *9 (D. Minn. Oct. 4, 2010) ("[P]risoners' First Amendment rights are subject to greater restrictions not because of their convictions *per se*, but because prison administrators need to be able to perform their duties safety and effectively.  Those same concerns are just as applicable in a civil commitment setting as in a prison setting."), *adopting report and recommendation*, 2010 WL 4822888 (D. Minn. Nov. 22, 2010).

The Court has already concluded that Plaintiff has plausibly alleged a violation of his right to exercise his religion freely.  *See Hager*, 735 F.3d at 1013.  The question now becomes whether the particular rights at issue were clearly established.  Plaintiff asserts that "'[i]t has been clearly established law since 1972 that prison officials must afford inmates a reasonable opportunity to practice their religion.'" (Pl.'s Opp'n at 27 (quoting *Thomas v. Gunter*, 103 F.3d 700, 702 (8th Cir. 1997) (internal quotation omitted)).)  But Plaintiff's proposed construction— albeit logically sound—overlooks the need for greater specificity in defining the right at issue in the context of qualified immunity.  *See Smith*, 2014 WL 2535298, at *3; *Williams*, 600 F.3d at 1013.

Plaintiff alleges that, under the policies of Defendants Jesson, Johnston, and Moser, he is not allowed to (1) wear his Kufi at all times; (2) pray or study the Koran in the yard; (3) wear his prayer beads at all times; or (4) have his prayer oils in his room.  According to the Spiritual

Practices policy, which this Court previously determined was encompassed by the Amended Complaint, "[c]lients [are] allowed to wear or use personal or spiritual items in their rooms and during scheduled spiritual ceremonies and studies." (Spiritual Practices ¶ D(3), Ex. 2 to Alpert Aff., ECF No. 18-1.) "Necklaces identified as spiritual items must be worn under the clothing." (*Id.* ¶ D(5).) The Spiritual Practices policy further states that "[t]he use of spiritual items that are considered contraband is governed by MSOP Policy 302.310, 'Use of Controlled Items During Spiritual Ceremonies.'" (*Id.* ¶ E(2) (emphasis omitted).) Scented oils are classified under this group of controlled items and "are a group item only and may not be possessed by individual clients." (Use of Controlled Items During Spiritual Ceremonies ¶ I(1), Ex. 3 to Alpert Aff., ECF No. 18-1.) These controlled items may be used during spiritual ceremonies and are stored in an area with other group items. (*See generally id.*)

In *Rogers v. Scurr*, an Iowa federal court ordered that Muslim prisoners be allowed to wear prayer caps and robes outside of their prayer services, concluding that the prison regulation restricting the use of these items to prayer services violated the prisoners' right to exercise their religion freely. 676 F.2d 1211, 1215 (8th Cir. 1982). Noting that the prisoners retained those First Amendment rights not inconsistent with their incarcerated status, the Eighth Circuit reversed and concluded that "no constitutional right of the prisoners was violated by the prohibition on wearing prayer caps and robes outside religious services." *Id.* at 1216. The Eighth Circuit found the prison officials' explanation of the policy—"such attire makes it too easy to conceal contraband"—"eminently reasonable." *Id.* at 1215.

Similarly, in *Butler-Bey v. Frey*, the Eighth Circuit upheld a prison regulation prohibiting "the wearing of headgear in the prison visiting room, dining room, chapel, school, and administration building." 811 F.2d 449, 451 (8th Cir. 1987). The *Butler-Bey* prisoners were

42

members of the Moorish Science Temple for whom the wearing of fezes has religious significance. *Id.* Although agreeing that the regulation infringed upon the prisoners' religious practice, the Eighth Circuit upheld the regulation based on prison officials' concern over the smuggling of contraband, stating that "prison officials need only show that the regulated practice creates a *potential* threat to institutional security." *Id.*

Likewise, in *Jihad v. Fabian*, a court in this District upheld a prison policy permitting religious headwear to be worn only in the chapel or prisoner's cell and the denial of a prisoner's request that he be allowed to exit his cell to perform his daily prayers. No. 09-cv-1604 (SRN/LIB), 2011 WL 1641767, at *4, 8 (D. Minn. May 2, 2011). The challenged policy provided "that only state-issued headwear may be worn outside of the chapel or [the prisoner's] cell." *Id.* at *8. Like *Rogers*, the policy at issue permitted the prisoner to wear his Kufi in his cell and the chapel. *Id.* The district court agreed with the magistrate judge's determination that the prisoner "failed to establish that not being allowed to wear a [K]ufi, as opposed to the readily available state-issued headwear, substantially burdened his religious exercise." *Id.* The prisoner's "primary concern . . . was being able to cover his head in public, and the . . . policy does not prohibit this, nor does [the prisoner] claim that the state-issued headwear is inadequate for religious reasons." *Id.* But "[e]ven if the policy did constitute a substantial burden . . . ," the district court reasoned, the prison officials "established that the policy is narrowly tailored to fulfill a compelling governmental interest—the compelling interests of prison safety and security justify uniform dress regulations. Because the policy still allows [the prisoner] to cover his head, albeit not with his preferred headcovering, it does not substantially burden his religious exercise." *Id.*

*Jihad* also involved "a policy preventing [the prisoner] from performing his five daily prayers outside of his cell, which contains a toilet." *Jihad v. Fabian*, No. 09-cv-1604 (SRN/LIB), 2011 WL 1641885, at *1 (D. Minn. Feb. 17, 2011), *adopting report and recommendation*, 2011 WL 1641767. Assuming that the policy substantially burdened the prisoner's right to exercise his religion freely, the district court nonetheless held that "[t]o permit Muslim inmates to move around the facility with greater access to public areas than that is given to other inmates, implicates institutional security and order[ a]nd . . . no other alternative would prevent a significant increase in the number of inmate movements within the facility each day." *Jihad*, 2011 WL 1641767, at *4.

In *Hodgson v. Fabian*, another court in this District considered a prison regulation restricting inmates' use of prayer oils to religious services in the chapel and prohibiting inmates from keeping prayer oils in their cells. 2009 WL 2972862, at *5, 13. The prison regulation was analyzed under the more demanding standard of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc-1 *et seq. Id.*; *see Jihad*, 2011 WL 1641767, at *3 ("[T]he legal analysis of policies affecting religion is stricter under the RLUIPA than under the Constitution[.] [I]f Plaintiff can succeed in establishing a probable violation of the RLUIPA, he can also establish a violation of the Free Exercise Clause."). The court concluded that "[e]ven if Plaintiff had established that the prisoner's prayer oil policy substantially burdens his religion, limiting use of prayer oils to the chapel and prohibiting the use of oils in cells does not violate RLUIPA." *Hodgson*, 2009 WL 2972862, at *13. The court reasoned that prison officials' safety and security concerns over the potential for oils to "be used as a weapon to throw at correctional officers or others inmates" and sold or traded among inmates were compelling interests, and

limiting the use of prayer oils to the chapel area was the least restrictive means of furthering that interest. *Id.*

In *Weir*, an inmate challenged a rule prohibiting him from taking personal property into the yard, which prevented him from taking his Bible with him into the yard. 114 F.3d at 821, 822. The Eighth Circuit held that the rule did not substantially burden the inmate's practice of religion because "[a]lthough this rule prevented [him] from taking his Bible into the prison yard, [he] was free to use his Bible in his cell in order to prepare for the evangelism and counseling he sought to do with the assistance of his Bible in the prison yard." *Id.* at 822.

In *Charles v. Frank*, the Seventh Circuit upheld a prison regulation prohibiting an inmate from wearing a visible string of prayer beads outside of his cell. 101 Fed. App'x 634, 634 (7th Cir. 2004). The inmate was permitted "to wear and use his prayer beads in his cell, and to carry and use them outside of his cell so long as they remain unseen in a pocket. The defendants, however, . . . banned [the inmate] from wearing his [prayer beads] outside of his cell except when congregating with other Muslims for religious services." *Id.* The Seventh Circuit "note[d] at the outset that this might be a very different case if [the inmate] was pressing the broader contention that the prohibition against wearing Muslim prayer beads was absolute, rather than limited only by the constraints of [the regulation]." *Id.* at 636. The Seventh Circuit concluded that the regulation was the least restrictive means of preventing gangs from "usurping [religious emblems] as indicia of membership." *Id.* The Seventh Circuit stated that the inmate

> can display his preferred [prayer beads] in his own cell, and he can carry [them] and use [them] at will throughout the prison as long as [they] remain[] out of sight in his pocket. And, what is critical here, the defendants now acknowledge that the government policy allows [the inmate] to wear prayer beads around his neck provided that they are small enough to be unobtrusive under his shirt when outside of his cell.

45

*Id.*

Based on the foregoing, this Court determines that the rights allegedly violated were not clearly established rights, and Defendants Jesson, Johnston, and Moser are entitled to qualified immunity in their individual capacities.   It is not clearly established that Plaintiff is constitutionally entitled to wear his Kufi at all times; wear his prayer beads at all times without restrictions; have no limitations on the areas in which he may pray; use his religious items in the yard as well as his room; and keep prayer oils in his room for personal use outside of religious services.

Plaintiff may ultimately not succeed in establishing that MSOP's policies substantially burden the free exercise of his religion.  *See Jihad*, 2011 WL 1641767, at *4 n.3.  And just as "[a] prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so," *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004), the Constitution does not mandate that civilly committed individuals be afforded their preferred means of practicing their religion as long as they are allowed sufficient means to do so. *See also Senty-Haugen*, 462 F.3d at 886.  "[T]he Court must consider challenges to MSOP restrictions that allegedly inhibit First Amendment interests in light of the legitimate polices and goals of the commitment system, to whose custody and care Plaintiff[] ha[s] been committed." *Karsjens*, 2014 WL 667971, at *13.  At this stage, the Court simply is not in a position to determine whether MSOP's policies are reasonably related to legitimate institutional and therapeutic interests. *Id.*  Defendants' blanket assertion that "the[se] policies impose reasonable restrictions . . . based on safety and security concerns" is not enough.  (Defs.' Mem. in Supp. at 31.)

Therefore, the Court recommends that Defendants' motion to dismiss be granted with respect to Plaintiff's free exercise claim against Defendants Jesson, Johnston, and Moser in their *individual capacities* and be denied with respect to Plaintiff's claim against these Defendants in their *official capacities*.

## IV. RECOMMENDATION

Based upon the file, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 15) be **GRANTED IN PART** and **DENIED IN PART** as set forth above.

Dated:  July 31, 2014                                     s/ Tony N. Leung
                                                          Tony N. Leung
                                                          United States Magistrate Judge
                                                          for the District of Minnesota


                                                          *Pittman v. Jesson et al.*
                                                          Case No. 12-cv-1410 (SRN/TNL)


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **August 15, 2014**.