## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Michael Pittman, | Case No. 12-cv-1410 (SRN/TNL) |
| Plaintiff, | |
| v. | **ORDER** |
| Lucinda Jesson, Nancy Johnston, Kevin Moser, Terry Kneisel, Brian Ninneman, Rob Rose, Thomas Snedker, Robert Bender, Justin Wright, Tom Cherro, Janelle Luczak, Jeanne Dreher, Jessica Ranem, Mike Anderson, and Amanda Furey in their individual and official capacities, | |
| Defendants. | |

Daniel E. Gustafson and Raina Borrelli, Gustafson Gluek PLLC, 120 South 6th Street, Suite 2600, Minneapolis, MN, 55402, for Plaintiff.

Adam H. Welle, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1100, St. Paul, MN, 55101-2128, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

## I.      INTRODUCTION

This matter is before the Court on Plaintiff's Objections [Doc. No. 26] and

Defendants' Objections [Doc. No. 27] to United States Magistrate Judge Tony N. Leung's

July 31, 2014, Report and Recommendation ("R & R").  The magistrate judge

recommended that Defendants' Motion to Dismiss Plaintiff's First Amended Complaint be

granted in part and denied in part. (R & R at 47 [Doc. No. 24].)  For the reasons set forth

below, Plaintiff's Objections are overruled in part and sustained in part.  Defendants'

Objections are similarly overruled in part and sustained in part.

## II.   BACKGROUND

The Magistrate Judge's R & R thoroughly documents the factual and procedural background of the case, which is incorporated here by reference.  The 42 U.S.C. § 1983 claims in this case arise from alleged racial and religious discrimination that Michael Pittman ("Pittman" or "Plaintiff") experienced, and continues to experience, as a patient in the Minnesota Sex Offender Program ("MSOP"). [1]  (See generally Am. Compl. [Doc. No. 10].)  The MSOP is maintained by the Commissioner of the Minnesota Department of Human Services.  See Minn. Stat. Ann. § 246B.02.

Plaintiff was civilly committed to the MSOP on December 1, 2010 under Minn. Stat. § 253B.185. (Am. Compl. ¶ 4 [Doc. No. 10]; Defs.' Mem. of Law in Support of Defs.' Mot. to Dismiss at 3 [Doc. No. 17].)  He is an African American[2] and is a practicing Muslim. (Am. Compl. ¶ 23 [Doc. No. 10].)

### A.  Equal Protection/Racial Discrimination Claims

Plaintiff alleges that he has experienced ongoing racial discrimination by MSOP staff since he was committed.  (Id. ¶ 25.)  However, he contends that "the discrimination

---

[1]     While Plaintiff's prayer for relief refers to "state constitutional, statutory, and common law claims," he fails to plead or reference these claims in the Amended Complaint.  (See Am. Comp. [Doc. No. 10].)  Therefore, the Court focuses solely on Plaintiff's § 1983 claims.  Moreover, Plaintiff confirms in his Opposition to Defendants' Motion to Dismiss that he "does not allege any state constitutional or state common law claims." (Pl.'s Opp'n at 2 n.1 [Doc. No. 20].)

[2]     Although Plaintiff self-identifies as an "African American" in his Amended Complaint (Am. Compl. ¶ 23[Doc. No. 10]), he also refers to himself as "black" (see id. ¶¶ 27, 31, 44).  Therefore, the Court uses the terms "African American" and "black" interchangeably throughout this Order.

worsened in July 2012 following an incident Plaintiff was involved in on his living unit."

(Id.)  Furthermore, Pittman alleges several incidents of MSOP staff treating black and white

patients unequally, or inadequately responding to complaints of unequal treatment.

### 1. Defendants Robert Bender, Justin Wright, Tom Cherro, Janail Luczak,[3] Jeanne Dreher, and Jessica Ranem

Pittman alleges that he had an altercation with a group of MSOP Security Counselors

in July 2012.  (Id.)  The group of MSOP Security Counselors included Defendants Robert

Bender, Justin Wright, Tom Cherro, Janail Luczak, Jeanne Dreher, and Jessica Ranem.

(Id.)  Plaintiff claims that after the July 2012 altercation, this group of Security Counselors

threatened to kill him and repeatedly called him racial epithets.  (Id.)  Specifically, Plaintiff

alleges that the Security Counselors made statements such as, "I hate that nigger," "I wish

he was dead," and "If I get my hands on that nigger, I'm going to kill him."  (Id.)  They also

referred to Plaintiff as "monkey" and "ape."  (Id.)  In his Amended Complaint, Pittman does

not clarify whether each named Defendant made each of these comments or used each of

the listed racial epithets.  Nor does Pittman clarify whether these statements were made

directly *to* him, or whether he was informed by a third party that the Security Counselors

made these comments.

Pursuant to § 1983, Plaintiff claims that Defendants Robert Bender, Justin Wright,

Tom Cherro, Janail Luczak, Jeanne Dreher, and Jessica Ranem are liable for violating the

Fourteenth Amendment of the United States Constitution because they continuously racially

---

[3]      Both parties inconsistently spell Defendant Luczak's first name.  While in the
caption of the case, Luczak's first name is spelled "Janelle," throughout the briefing both
parties spell her first name "Janail."  The Court uses "Janail."

discriminate against Plaintiff.  (<u>Id</u>. ¶¶ 49-54.)

Plaintiff additionally alleges that as a black man, he is observed by MSOP staff more closely than white patients.  (<u>Id</u>. ¶ 32.)  He specifically alleges that on January 16, 2013, Defendant Luczak, one of the Security Counselors who called Plaintiff racial slurs, followed Plaintiff as he moved around his living unit.  (<u>Id</u>.)

### 2.  Defendant Tom Snedker

Pittman also alleges that while he was walking to Health Services on February 16, 2013, an unnamed Security Counselor said to him, "What up snicker."  (<u>Id</u>. ¶ 26.) Defendant Tom Snedker, also a MSOP Security Counselor, overheard this exchange.  (<u>Id</u>.) Plaintiff contends that the term "snicker" was used in place of the epithet "nigger."  (<u>Id</u>.) Defendant Snedker attempted to persuade Plaintiff that the greeting was not meant as a racial slur.  (<u>Id</u>. ¶ 26.)  Plaintiff asserts that Defendant Snedker "did not ask the Security Counselor to explain himself, apologize, or address the statement in any way."  (<u>Id</u>.) Pittman brings an equal protection race discrimination claim against Defendant Snedker, pursuant to § 1983, for his failure to intervene or reprimand his fellow Security Counselor.

### 3.  Defendant Terry Kneisel

Plaintiff further alleges that he discussed the "snicker" incident with MSOP Program Manager, Defendant Terry Kneisel.  (<u>Id</u>.)  Defendant Kneisel allegedly "told Plaintiff that he would not discuss the issue with his staff and that staff does not have to offer Plaintiff an explanation or apology for using the word 'snicker.'"  (<u>Id</u>.)  Plaintiff's equal protection claim against Defendant Kneisel appears to be based on Kneisel's affirmative refusal to investigate Plaintiff's claim.

4

### 4.   Defendant Mike Anderson

Pittman additionally alleges that on March 11, 2012, he was engaged in "horseplay" with another black patient.  (Id. ¶ 27.)  Defendant Mike Anderson, a MSOP Security Counselor, reprimanded Plaintiff for this behavior.  (Id.)  Plaintiff contends that later that same day, a group of white patients were engaged in "horseplay" in front of Defendant Anderson, but Anderson did not reprimand the white patients.  (Id.)

### 5.   Defendant Amanda Furey

Defendant Amanda Furey, another MSOP Security Counselor, was directly beside Defendant Anderson while the white patients engaged in "horseplay."  (Id.)  Like Defendant Anderson, she also did not reprimand the white patients for their behavior.  However, Plaintiff does not allege that Defendant Furey treated black patients engaged in "horseplay" differently from white patients.

### 6.   Defendant Rob Rose

Pittman alleges that Defendant Rob Rose, MSOP Unit Director for 1-D, is liable for violating Plaintiff's rights under the Equal Protection Clause because he failed to ensure that the MSOP Security Counselors treat black and white patients similarly.  Plaintiff specifically alleges two incidents in which Defendant Rose failed to adequately respond to complaints of unequal treatment.

The first incident occurred on September 28, 2011.  (Id. ¶ 31.)  On that day, Plaintiff submitted a client request form to Defendant Rose, which stated that "[S]ecurity [C]ounselors on Unit 1-D allowed white patients to congregate in a group and talk with each other while on the unit[,] but did not allow black patients to do the same."  (Id.)  Plaintiff's

Amended Complaint is silent as to whether Defendant Rose responded to this complaint.

The second incident occurred on March 18, 2012.  (Id. ¶ 30.)  As a practicing Muslim, Pittman is committed to wearing his Kufi, "which is a head covering that Muslim men wear as a symbol of humility at all times," in order "to identify his religious affiliation."  (Id. ¶ 40.)  However, the MSOP rules and staff members prohibit Plaintiff from wearing his Kufi except when he is inside his cell and during Jumah services, which are held from 12:30-1:30 pm on Fridays.  (Id. ¶¶ 40-41.)  If MSOP staff determine that a patient has violated a behavioral rule, they may issue a Behavioral Expectation Report ("BER").  (Id. ¶ 28.)  On March 18, 2012, Plaintiff received a BER for wearing a "hat," his Kufi, outside of his unit.  (Id. ¶ 30.)  Later the same day, Pittman alleges he "observed white patients wearing hats out of their units before going outdoors and none of them received any reprimands or a BER."  (Id.)  Plaintiff alleges that he submitted a client request to Defendant Rose regarding this perceived unequal use of the BER disciplinary tool for black and white patients.  (Id.)  Defendant Rose allegedly responded to this request by stating that "all patients are held to the same standards."  (Id.)  Plaintiff contends that because the unequal treatment persists, Defendant Rose's response was perfunctory and disingenuous.  (See id. ¶ 39.)

### 7.  Defendant Brian Ninneman

Pittman alleges that Defendant Brian Ninneman, MSOP Unit Director of the Omega Unit and Behavioral Therapy Unit Supervisor (id. ¶ 9, 33), also failed to adequately respond to two reports of unequal treatment.

The first report was on February 8, 2013, when Plaintiff overheard another MSOP

patient repeatedly use the word "nigger." (Id. ¶ 33.) In response to this incident, Plaintiff

filed a client request form with Defendant Brian Ninneman. (Id.) Defendant Ninneman

allegedly responded by explaining that "all reports of racial remarks are taken seriously and

followed up on." (Id.) Approximately one month later, Pittman again heard the same

MSOP patient repeatedly use the word "nigger." (Id.) Plaintiff reported this incident to

Security Counselor Tom Macie and filed an additional client request form. (Id.) Plaintiff

does not specify to whom he submitted the form. Instead, he alleges that the response to his

complaint stated that "the issue was addressed by staff." (Id.)

The second report of unequal treatment by Ninneman was on February 9, 2013,

when Pittman submitted a client request form to Ninneman, "asking why patients are

allowed to use discriminatory language without consequences." (Id. ¶ 34.) Ninneman

allegedly responded that "the issues are always addressed by the client's unit director." (Id.)

Plaintiff alleges that despite Defendant Ninneman's responses, he continues to hear

racial slurs directed at him by the MSOP staff and patients. (Id. ¶ 36.) Therefore, Pittman

contends that Defendant Ninneman's responses are mere lip service, and the persistent use

of discriminatory language by the MSOP patients is indicative of Defendant Ninneman's

failure to address this behavior. (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 17 [Doc. No. 20].)

### 8.   The MSOP's Culture of Racism

Pittman alleges that all of these incidents of racial discrimination and unequal

treatment are reflective of the MSOP's culture of racism and discrimination. (See id. ¶¶ 36-

39.) Furthermore, he alleges that despite filing grievances "he continues to hear racial slurs

directed at him from MSOP staff and other MSOP patients." (Id. ¶ 36.) Plaintiff alleges

that the MSOP's institutional racism has been documented through both internal and external investigations and reports.  (Id. ¶ 37-38.)  In 2005, the Minnesota Ombudsman for Mental Health and Mental Retardation allegedly determined that the MSOP lacked diversity training and cultural diversity.  (Id. ¶ 37.)  The same year, the MSOP conducted an internal review and made similar findings.  (Id.)  The evaluation was completed by the MSOP's Hospital Review Board ("HRB").  (Id.)  The HRB is a three member panel that hears MSOP patient grievances and concerns.  (Id. ¶ 36; Minn. Stat. Ann. § 253B.22.)  In response to "numerous patient complaints and discriminatory and harassing practices by MSOP staff," the HRB met with groups of minority patients and recommended that the MSOP "increase diversity and improve the racial awareness and sensitivity of its staff, increase diversity on its staff, adjust programming for various minority groups, and implement a zero-tolerance policy for discriminatory or harassing conduct."  (Id. ¶ 36.)

An external review of institutional racism at the MSOP made similar recommendations.  Plaintiff alleges that in 2006, the MSOP retained an outside expert, Eugene Begay, to evaluate issues relating to diversity and racism at the MSOP.  (Id. ¶ 38.) Begay authored a report and sent it to the then-site director of the MSOP's Moose Lake facility, Dean Mooney.  (Id.)  The report recommended that the MSOP strive to "increase[e] staff diversity, institut[e] policies that promote diversity, and seek outside accreditation." (Id.)

Plaintiff alleges that the MSOP's racist culture, "attitudes," or "policies" have not changed since 2005-2006.  (Id. ¶ 39.)  In fact, Plaintiff raised his concerns about racial discrimination before the HRB.  (Id. ¶ 36.)  However, "the HRB did not recommend that

the MSOP make any changes to their policy or do any follow-up investigation of

Plaintiff's claims of racial discrimination."  (Id.)

As a result of the perceived policies and practices that permit racial discrimination,

Plaintiff alleges that pursuant to § 1983 (a) Defendant Lucinda Jesson, the Commissioner of

the Minnesota Department of Human Services ("DHS"), (b) Defendant Nancy Johnston, the

Executive Director of MSOP, and (c) Defendant Kevin Moser, the Director of MSOP, have

violated his Fourteenth Amendment equal protection rights.

### a.  Defendant Lucinda Jesson

As the Commissioner of the Minnesota DHS, Defendant Lucinda Jesson, is

responsible for "adopt[ing] rules to govern the operation, maintenance, and licensure of

secure treatment facilities operated by the [MSOP]," and "establish[ing] an evaluation

process to measure outcomes and behavioral changes as a result of treatment compared

with incarceration without treatment, to determine the value, if any, of treatment in

protecting the public."  Minn. Stat. Ann. § 246B.04.  Consequently, Plaintiff alleges that

Defendant Jesson, "in her individual and official capacity, implemented, retained[,] and

carried out [racially discriminatory] policies through MSOP that violated the

constitutional rights of Plaintiff."  (Am. Compl. ¶ 5 [Doc. No. 10].)

### b.  Defendant Nancy Johnston

As the Executive Director of the MSOP, Defendant Nancy Johnston, "is charged

with overall responsibility for the operation of the [MSOP]."  Minn. Stat. Ann. §

246B.01.  Plaintiff contends that Defendant Johnston is well aware of issues of racial

discrimination because of her position of authority, the grievance he filed with the HRB,

and the numerous client request forms he has submitted.  (Am. Compl. ¶ 36 [Doc. No. 10].)  Therefore, Plaintiff alleges that Defendant Johnston, "in her individual and official capacity, implemented, retained[,] and carried out [racially discriminatory] policies through MSOP that violated the constitutional rights of Plaintiff."  (Id. ¶ 6.)

### c.  Defendant Kevin Moser

Finally, Pittman alleges that as the Director of the MSOP, Defendant Kevin Moser, has also "been made aware" of Plaintiff's claims of racial discrimination because of the numerous complaints Plaintiff has filed.  (Id. ¶ 36.)  Thus, he similarly alleges that Defendant Moser, "in his individual and official capacity, implemented, retained[,] and carried out [racially discriminatory] policies through MSOP that violated the constitutional rights of Plaintiff."  (Id. ¶ 7.)

### B.  Free Exercise/Religious Discrimination Claims

In addition to claims of racial discrimination, Plaintiff also alleges several claims of religious discrimination against Defendants Jesson, Johnston, and Moser, in their individual and official capacities.  (Id. ¶¶ 5-7.)  Plaintiff contends that these three Defendants created and implemented policies that prohibit Plaintiff from practicing his religious beliefs.  (Id. ¶ 41.)  As noted above, Pittman identifies as a "practicing Muslim," and his religious practice includes wearing a Kufi, a religious head covering.  (Id. ¶ 40.)

Plaintiff alleges that two MSOP rules prohibit him from wearing his Kufi at all times, "as his religion dictates."  (Id. ¶ 41.)  First, the MSOP has a Client Hygiene/Dress Code policy, policy number 303.020, which permits patients to wear "headwear" only in their assigned rooms, in the yard, and for approved religious practices only.  (Id.)

10

"Headwear….is defined as 'hats, bandanas, scarves, headbands, hoods, do-rags[,] and shower caps." (Id.)  Second, the MSOP has a Spiritual Practices policy, policy number 302.300, which provides that "patients may only wear or use personal religious items in their rooms and during scheduled religious services, ceremonies, and meetings." (Id.)  This policy further states that the "[u]se of religious items in public areas must be approved by the Religious Services Coordinator and the unit team." (Id.)

Pittman contends that together these two policies prohibit him from wearing his Kufi "except for when he is inside his cell and during Jumah services, which are held from 12:30-1:30 pm on Fridays.  He is not allowed to wear his Kufi when walking to and from his religious studies or services." (Id. ¶ 40.)  This is because the MSOP staff characterize Plaintiff's Kufi as a "hat." (Id. ¶ 45.)  Plaintiff contends that a Kufi is not a "hat" and is instead a "Muslim head covering." (Id.)

While the two policies described above limit when Plaintiff may wear his Kufi, Plaintiff does not comply with these limitations. (Id. ¶¶ 41-43.)  Pittman alleges that he received BERs on March 13, March 18, April 8, and April 10, 2012 "as a result of wearing his Kufi outside his room" and refusing to remove his Kufi when asked. (Id. ¶¶ 42-43.)  Although Plaintiff's religious discrimination claims are only alleged against Defendants Jesson, Johnston, and Moser, Plaintiff asserts that he has observed MSOP Security Counselor Kevin Dreher "checking to see if black patients are wearing a Kufi as they leave the [MSOP] buildings." (Id. ¶ 44.)  Plaintiff's Amended Complaint is silent as to whether Defendant Dreher similarly checks white patients.

Pittman also alleges that he is (1) "not allowed to bring his Koran out to the yard area

of the MSOP facility where he lives," (2) "he cannot wear his prayer beads at all times," (3) "he cannot do his daily prayers in the MSOP yard area," and (4) "[he] is not allowed to have his praying oils in his room."  (Id. ¶ 46.)  Plaintiff contends that these are all "significant aspects" of his practice of Islam.  (Id.)

### C.  Injury and Damages

Plaintiff alleges that as a result of the racial and religious discrimination he experienced at the MSOP: (1) he has high blood pressure, (2) he had surgery to repair torn stomach lining from stress on February 18, 2013, (3) he participated in anger and assertiveness training from March to June 2013, and (4) he has trouble sleeping.  (Id. ¶ 48.)

### D. Procedural History and Magistrate Judge's R & R

Plaintiff originally filed this lawsuit pro se on June 13, 2012 [Doc. No. 1].  At that time, the case was stayed by Chief Judge Michael Davis pending the outcome of Karsjens, et al. v. Jesson, et al., 11-cv-3659 [Doc. No. 3].  The stay was lifted on June 7, 2013 [Doc. No. 6].  Plaintiff later obtained counsel (Not. of Appearance [Doc. No. 8]) and filed an Amended Complaint on October 17, 2013 (Am. Compl. [Doc. No. 10]).  On November 27, 2013, Defendants moved to dismiss Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P 12(b)(1) and 12(b)(6).  (Defs.' Mot. to Dismiss [Doc. No. 15].)  Plaintiff filed a response to Defendants' Motion to Dismiss on December 18, 2013.  (Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") [Doc. No. 20].)  Defendants filed a Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the First Amended Complaint ("Defs.' Reply") on January 2, 2014 [Doc. No. 22].  This matter was referred to the magistrate judge pursuant to 28 U.S.C. § 636 and he heard the cross-motions on February 12, 2014 [Doc. No. 23].

On July 31, 2014, Magistrate Judge Leung recommended that Defendants' Motion to Dismiss Plaintiff's First Amended Complaint [Doc. No. 15] be granted in part and denied in part.  (R & R at 47 [Doc. No. 24].)  As to the race discrimination claims, the magistrate judge found that (1) Plaintiff pled sufficient facts to state a claim against Defendants Bender, Wright, Cherro, Luczak, Dreher and Ranem (R & R at 27 [Doc. No. 24]); (2) Plaintiff failed to state a claim against Defendant Snedker (id. at 29); (3) Plaintiff sufficiently stated a claim against Defendant Kneisel (id. at 30); (4) Plaintiff failed to state a claim against Defendants Ninneman and Rose (id. at 23); (5) Plaintiff successfully stated claims against Defendants Anderson and Furey (id. at 32); and (6) Plaintiff plausibly alleged that Defendants Jesson, Johnston, and Moser, knew of and were in a position to remediate the alleged race discrimination "policies" (id. at 20-21).  As to the claims of religious discrimination, Magistrate Judge Leung determined that (1) Plaintiff plausibly alleged that, in their official capacities, Defendants Jesson, Johnston, and Moser substantially burdened Plaintiff's right to exercise his religion freely (id. at 37); and (2) Plaintiff's claims against Defendants Jesson, Johnston, and Moser, in their individual capacities, failed because the Defendants were entitled to qualified immunity (id. at 46-47).

On August 14, 2014, both Plaintiff [Doc. No. 26] and Defendants filed Objections to the R & R [Doc. No. 27].  Plaintiff filed a Response to Defendants' Objections to the R & R on August 28, 2014 [Doc. No. 28].  On the same day, Defendants filed a Response to Plaintiff's Objections to the R & R [Doc. No. 29].

## III.   DISCUSSION

### A.  Standard of Review

A party "may file and serve specific written objections to a magistrate judge's proposed findings and recommendations." D. Minn. LR 72.2(b)(1). The district court will review *de novo* those portions of the R & R to which an objection is made, and it "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3); D. Minn. LR 72.2(b)(3). Ordinarily, the district judge relies on the record of proceedings before the magistrate judge. D. Minn. LR 72.2(b)(3).

In this case, Defendants moved to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[4] When evaluating a motion to dismiss under Rule 12(b)(6), the Court assumes the facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff. Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986). However, the Court need not accept as true wholly conclusory allegations, Hanten v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions the plaintiff draws from the facts pled. Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990). In addition, the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss. See Fed. R. Civ. P. 12(d).

---

[4] Defendants also moved to dismiss Plaintiff's claim for monetary damages from Defendants in their official capacities, pursuant to Fed. R. Civ. P. 12(b)(1). Plaintiff stated that he "does not seek monetary damages from Defendants in their official capacities." (Pl.'s Opp'n at 26, n. 7 [Doc. No. 20].) Nonetheless, because "[i]t [was] not clear from the Amended Complaint that any monetary damages are not being sought from Defendants in their official capacities," the magistrate judge ruled on this issue. He properly determined that "the Eleventh Amendment precludes an award of money damages against a state official acting in his or her official capacity." (R & R at 12 [Doc. No. 24].) Since neither Defendants nor Plaintiff object to this finding, the Court focuses on Defendants' basis to dismiss Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(6).

The Court may, however, consider exhibits attached to the complaint and documents that are necessarily embraced by the pleadings, <u>Mattes v. ABC Plastics, Inc.</u>, 323 F.3d 695, 697 n. 4 (8th Cir. 2003), and may also consider public records.  <u>Levy v. Ohl</u>, 477 F.3d 988, 991 (8th Cir. 2007).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level."  <u>Id.</u> at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Twombly</u>, 550 U.S. at 555).  In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]."  <u>Twombly</u>, 550 U.S. at 556.

## B.  Defendants' Objections

Defendants assert several objections to the magistrate judge's R & R.  They object to Magistrate Judge Leung's finding that Plaintiff stated a plausible equal protection race discrimination claim against  Defendants Bender, Wright, Cherro, Luczak, Dreher, Ranem, Anderson, Furey, and Kneisel.  (Defs.' Obj. at 2, 4 [Doc. No. 27].)  They also object to the R & R's finding that Plaintiff stated a plausible equal protection race discrimination claim against Defendants Jesson, Johnston, and Moser.  (<u>Id.</u>)  Finally, they object to Magistrate Judge Leung's finding that Plaintiff stated plausible religious discrimination claims against Defendants Jesson, Johnston, and Moser, in their official

capacities.  (Id. at 6.)  Below, the Court addresses Defendants' objections to the

magistrate judge's recommendation for each defendant.  Because Defendants Bender,

Wright, Cherro, Luczak, Dreher, and Ranem are similarly situated, the Court discusses

Plaintiff's claims against these Defendants together.  Whereas the Court individually

discusses the claims against Anderson, Furey, Kneisel, Jesson, Johnston, and Moser.

### 1.  Defendants Bender, Wright, Cherro, Luczak, Dreher, and Ranem

Defendants object to Magistrate Judge Leung's recommendation that Plaintiff

stated an actionable equal protection claim against Defendants Bender, Wright, Cherro,

Luczak, Dreher, and Ranem.  While Pittman alleges that the Security Counselors made

racially derogatory statements and threats, Defendants claim that based on the face of the

Amended Complaint (hereinafter, "Complaint"), (1) the statements were "not made to

Pittman" or "even intended to reach Pittman," and (2) the statements were not severe

enough to state an actionable Fourteenth Amendment claim.  (Defs.' Obj. at 3 [Doc. No.

27].)

In order to determine whether Plaintiff sufficiently alleges that the statements were

made to him and by each Defendant, the Court must analyze the language in the

Complaint.  To survive a motion to dismiss, Plaintiff's Complaint must state enough facts

"to raise a reasonable expectation that discovery will reveal evidence of [the claim]."

Twombly, 550 U.S. at 556.  Here, Pittman states in his Complaint that he has heard this

group of Defendants "use the words 'monkey' and 'ape' towards him."  (Am. Compl. ¶ 25

[Doc. No. 10].)  He also alleges that these Defendants "make [other racially derogatory]

statements about Plaintiff."  (Id.)  Based on this phrasing in the Complaint, the Court agrees

with the magistrate judge that Plaintiff states enough facts "to raise a reasonable expectation that discovery will reveal evidence" substantiating the claim that each of these Defendants made racially derogatory comments directly to Plaintiff.  See Twombly, 550 U.S. at 556.

As to Defendants' objection about the severity of the derogatory comments, the threat or harassment must be "so brutal or wantonly cruel as to shock the conscience" in order to state an actionable constitutional violation.  King v. Olmsted County, 117 F.3d 1065, 1067 (8th Cir. 1997), see Der v. Connolly, 825 F. Supp. 2d 991, 998 (D. Minn. 2010).  Generally, "mere verbal threats made by a state-actor do not constitute a § 1983 claim."  Hopson v. Fredericksen, 961 F.2d 1374, 1378 (8th Cir. 1992) (citing Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985)).  The only exception to this general rule is when the verbal threat rises to the level of a "wanton act of cruelty."  Burton v. Livingston, 791 F.2d 97, 99-100 (8th Cir. 1986).  In Burton v. Livingston, the Eighth Circuit held that this severity level was reached when the defendant called the plaintiff "nigger," pointed and cocked his revolver at plaintiff's head, and threatened to shoot him. Id. at 98.  In contrast, the Eighth Circuit determined that an actionable constitutional claim was not stated when a defendant told noisy inmates to "shut up" on one occasion, Lewis v. Jacks, 486 F.3d 1025, 1028 (8th Cir. 2007), when a "guard [once] ridiculed the color of [a plaintiff's] palms and told him to smile so that he could be seen in the dark," Blades v. Schuetzle, 302 F.3d 801, 805 (8th Cir. 2002), or even when a defendant once uttered a racial slur while threatening to knock out a plaintiff's teeth, Hopson v. Fredericksen, 961 F.2d 1374, 1378 (8th Cir. 1992).

In this case, Pittman alleges that Defendants Bender, Wright, Cherro, Luczak,

Dreher, and Ranem not only used racially derogatory language when addressing and referring to Plaintiff, but also that they threatened to kill him. (Am. Compl. ¶ 25 [Doc. No. 10].) The Court reads Plaintiff's Complaint as alleging not only that Defendants have each individually threatened Plaintiff on several occasions in the past, but also that they each continue to threaten Plaintiff. (See id., using the present tense "make statements" as opposed to past tense of "made statements.") Thus, the pervasiveness and severity of Plaintiff's allegations distinguish this case from Blades, Hopson, and Lewis, which involved isolated incidents of verbal abuse.

Furthermore, Pittman's case is distinguishable from Blades, Hopson, and Lewis because he alleges that Defendants made death threats, as opposed to only threats of injury. In Hopson, the Eighth Circuit held that an officer's threat to injure an inmate was not actionable because unlike the defendant in Burton, the officer "never threatened to kill [the plaintiff]," nor did he "brandish[] a lethal weapon." Hopson, 961 F.2d at 1378-79. Therefore, the act was not "brutal" or "cruel" enough. Id. at 1379. Here, while Plaintiff does not allege that Defendants brandished a weapon while threatening to kill him, c.f. Burton, 791 F.2d at 100, he does allege that they repeatedly made racially charged death threats. Thus, as the magistrate judge concluded, Plaintiff's case is more similar to Burton than other cases involving verbal threats made by correctional officers. (R & R at 27 [Doc. No. 24].) In Braden v. Wal-Mart Stores, Inc., the Eighth Circuit held that a court must read a complaint as a whole "to determine whether each allegation, in isolation, is plausible." 588 F.3d 585, 594 (8th Cir. 2009). Applying that principle to this case, the Court finds that based on the frequency of the racially charged death threats, the

number of MSOP employees charged with making the threats, and the severity of the statements, Plaintiff stated actionable equal protection claims against Defendants Bender, Wright, Cherro, Luczak,[5] Dreher, and Ranem.

## 2.   Defendant Anderson

Defendant objects to Magistrate Judge Leung's finding that Plaintiff stated an actionable Fourteenth Amendment race discrimination claim against Defendant Anderson for unequal treatment of white and black patients.  (Defs.' Obj. at 4 [Doc. No. 27].)  In order to state an equal protection race discrimination claim, Plaintiff must allege that (1) the MSOP staff treated similarly situated classes of patients differently, (2) the differing treatment was unrelated to a rational penal interest, and (3) the differing treatment was reflective of intentional or purposeful discrimination.  See Lewis v. Jacks, 486 F.3d 1025, 1028 (8th Cir. 2007) (holding that "unequal treatment of persons who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination") (internal quotations and citation omitted); Phillips v. Norris, 320 F.3d 844, 848 (8th Cir. 2003) (same).  The Eighth Circuit explained in Lewis v. Jacks that "[d]iscriminatory purpose can be proved with various kinds of direct and circumstantial evidence but is most often proved with evidence that similarly situated inmates were treated differently."  Lewis, 486 F.3d at

---

[5]      Plaintiff additionally alleges that MSOP staff observe black patients more closely than white patients. (Am. Compl. ¶ 32 [Doc. No. 10].)  As an example of this behavior, Plaintiff alleges that Defendant Luczak followed Plaintiff as he moved around his living unit.  (Id.)  The Court's determination that Plaintiff stated an actionable race discrimination claim against Defendant Luczak based on the derogatory comments she made is bolstered by this additional allegation of unequal treatment.

1028.  However, "[a] few individual examples of unequal treatment are insufficient to provide more than minimal support to an inference of classwide purposeful discrimination."  Weiler v. Purlett, 137 F.3d 1047, 1052 (8th Cir. 1998) (internal quotations and citation omitted).

In this case, Pittman alleges that Anderson reprimanded Plaintiff for engaging in "horseplay," but later the same day did not reprimand a group of white patients who were engaged in "horseplay."  (Am. Compl. ¶ 27 [Doc. No. 10].)  For the purposes of Defendants' Motion to Dismiss, the Court construes all reasonable inferences from the Complaint in the light most favorable to the Plaintiff.  Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986).  Therefore, the Court assumes that the "horseplay" Plaintiff engaged in was identical to the white patients' "horseplay."  The Court also assumes that Anderson's interest, and the MSOP's interest generally, in enforcing the disciplinary code is equivalent for white and black patients.  Accordingly, Plaintiff has pled enough facts to fulfill the first two requirements of his equal protection claim, (1) that he was treated differently than a similarly situated group of white patients, and (2) that the differing treatment was unrelated to a rational penal interest.  See Phillips, 320 F.3d at 848; Lewis, 486 F.3d at 1028.

However, Pittman must still establish that the differing treatment was reflective of intentional or purposeful discrimination.  Id.  While generally, one individual example of unequal treatment is insufficient to support an inference of purposeful discrimination, Weiler, 137 F.3d at 1052, the Court reads the Complaint as a whole to determine whether Plaintiff's allegation is plausible.  Braden, 588 F.3d at 594.  Magistrate Judge Leung

correctly determined that particularly because of "the pervasive use of racially derogatory language [alleged], it can be reasonably inferred" that Anderson did not discipline the white patients because of their race.  (R & R at 32 [Doc. No. 24].)

Defendants object to the magistrate judge's interpretation because they argue it imposes liability on Anderson "not based on [his] own specific discriminatory actions, but based on other unknown actions by other employees."[6]  (Defs.' Obj. at 5-6 [Doc. No. 27].)  The Court disagrees.  First, the Court is not imposing liability on any Defendant at this stage in the proceedings.  Second, simply because the alleged pervasive use of racially derogatory language informs the magistrate judge's analysis, does not mean that Anderson is charged with engaging in such behavior himself.  In Weiler, the Eighth Circuit concluded that because the plaintiff failed to identify any systemic race discrimination, a few individual examples of unequal treatment were insufficient to substantiate his § 1983 claim.  Weiler, 137 F.3d at 1052.  In contrast, Plaintiff alleges not only that a group of Defendants persistently discriminated against him with racist verbal threats, but also that the MSOP suffers from a culture of institutional racism, dating back to at least 2005.  (Am. Compl. ¶¶ 25, 37 [Doc. No. 10].)  Thus, the pervasively racist culture, which the Court takes as true at this stage of the pleadings, merely bolsters the plausibility that Anderson disciplined Plaintiff more severely than white patients because

---

[6]     Defendants found the magistrate judge's analysis particularly problematic because Anderson has no authority over the other employees who allegedly used the racially discriminatory language.  (Defs.' Obj. at 5-6 [Doc. No. 27].)  This is inapposite to the inquiry before the Court.  Since Anderson is not being held liable for the other employees' language, it is irrelevant whether he has any supervisory authority over them.

of his race.  In sum, the Court agrees with Magistrate Judge Leung's recommendation that Pittman adequately stated an equal protection claim against Anderson.

### 3.  Defendant Furey

Defendants also object to the magistrate judge's finding that Plaintiff stated an actionable equal protection claim against Defendant Furey for unequal treatment of black and white patients.  (Defs.' Obj. at 4-6 [Doc. No. 27].)  As explained above, in order for Plaintiff to state a viable equal protection claim he must first allege that Furey treated black and white patients differently.  Phillips, 320 F.3d 844, 848 (8th Cir. 2003); Lewis, 486 F.3d at 1028.  However, in Plaintiff's Complaint, he does not contend that Furey treated black and white patients differently.  In fact, Pittman only alleges that Furey witnessed a group of white patients engaged in "horseplay" and did not discipline them. (Am. Compl. ¶ 27 [Doc. No. 10].)

Magistrate Judge Leung concluded that because of "the pervasive use of racially derogatory language" it is plausible that Furey disciplined black and white patients differently because of their race.  (R & R at 32 [Doc. No. 24].)  The Court respectfully disagrees.  While the Court must read the Complaint as a whole when determining the plausibility of each individual claim, the Court cannot invent facts not alleged by Plaintiff.  See Braden, 588 F.3d at 594.  Defendants correctly state that "Pittman does not allege *any* discriminatory action by Defendant Furey."  (Defs.' Obj. at 5 [Doc. No. 27].) Unlike Plaintiff's allegation against Anderson, Plaintiff does not allege that Furey disciplined him for the same behavior for which he refused to discipline white patients. Therefore, Defendants' Motion to Dismiss Plaintiff's claim against Furey is granted.

22

### 4.  Defendant Kneisel

Defendants also object to Magistrate Judge Leung's finding that Pittman stated an actionable equal protection claim against Defendant Kneisel for failing to adequately respond to an incident of racist name calling.  (Defs.' Obj. at 6 [Doc. No. 27].)  In order to state an actionable race discrimination claim, Plaintiff must first allege that, as a member of a protected class, he was treated differently from similarly situated persons of a different group.  Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994) (explaining that "[a]bsent a threshold showing that she is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim.")  Additionally, Plaintiff must allege that Kneisel's response to the incident had a discriminatory effect and purpose.  Personnel Administration of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979) (holding that to succeed on an equal protection claim a plaintiff must prove that the state actor selected "a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group"); Washington v. Davis, 426 U.S. 229, 238 (1976) (holding that an equal protection claim must prove discriminatory effect and purpose); Lewis v. Jacks, 486 F.3d 1025, 1028 (8th Cir. 2007) (finding that "unequal treatment of persons who are 'entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination'"); Sargent v. Kemna, 133 Fed. App'x 355 (8th Cir. 2005) (finding that summary judgment was proper because the plaintiff failed to demonstrate that the dissimilar treatment was "intentional or purposeful discrimination"); Johnson v. Crooks, 326 F.3d 995, 1000 (8th Cir. 2003)

(holding that to succeed on a Fourteenth Amendment race discrimination claim plaintiff must prove "both discriminatory effect and discriminatory purpose") (citing United States v. Armstrong, 517 U.S. 456, 465 (1996)).

The magistrate judge discussed the Eighth Circuit's holding in Blades v. Schuetzle when analyzing whether Pittman successfully stated a claim against Kneisel.  (R & R at 29, Doc. No. 24].)  In that case, the court held that "the use of racially derogatory language, unless it is pervasive or severe enough to amount to racial harassment, will not by itself violate the fourteenth amendment."  Blades, 302 F.3d 801, 805 (8th Cir. 2002). Although Magistrate Judge Leung correctly stated the rule iterated in Blades, the Court respectfully disagrees with the magistrate judge's finding that the offensive "snicker" comment arises to an actionable level.  (R & R at 29-30 [Doc. No. 24].)[7]  Plaintiff's equal protection claim is not against the unnamed Security Counselor who called him "snicker," nor is it based on the severity of the name calling itself.  Rather, the Court reads Plaintiff's Complaint as stating a claim against Kneisel based on his failure to adequately respond to the incident.  For the purposes of Defendants' Motion to Dismiss,

---

[7]    Magistrate Judge Leung determined that the "snicker" incident amounted to unconstitutional harassment "in light of [his] conclusion that the racially derogatory and racially charged statements of MSOP staff were so pervasive and severe as to state a Fourteenth Amendment claim."  (R & R at 29 [Doc. No. 24].)  As the Court discussed earlier, under Eighth Circuit case law an individual incident of name calling on its own, unconnected to a death threat, does not amount to deprivation of a constitutional right. Lewis v. Jacks, 486 F.3d 1025, 1028 (8th Cir. 2007) King v. Olmsted County, 117 F.3d 1065, 1067 (8th Cir. 1997); Hopson v. Fredericksen, 961 F.2d 1374, 1378 (8th Cir. 1992); Burton v. Livingston, 791 F.2d 97, 99-100 (8th Cir. 1986).  Although the Court agrees that each allegation cannot be viewed in isolation, the Court finds that an unnamed Security Counselor's offensive "snicker" statement does not cross the constitutional line simply because other Defendants issued racially charged death threats.

the Court accepts as true Plaintiff's allegation that the Security Counselor used the term "snicker" in place of "nigger."  (See id. ¶ 26.)  Defendant Kneisel, the MSOP Program Manager, affirmatively refused to discuss the name calling incident with Plaintiff and essentially ignored Plaintiff's complaint.  (See id. ¶ 26.)

Reading all inferences in favor of Pittman, the Court finds that Kneisel's affirmative refusal to investigate the incident had a discriminatory effect.  Johnson, 326 F.3d at 1000.  The discriminatory effect is evident based on the veiled racial slur that was used.  Assuming that the term "snicker" was meant to imply "nigger," the Court reads Plaintiff's Complaint as alleging that Kneisel would have investigated Plaintiff's complaint of name calling had he not been a black man reporting a racial epithet. (See Am. Compl. ¶¶ 24, 26, 39 [Doc. No. 10].)  Thus, Plaintiff sufficiently alleges that Kneisel treated him differently because of his race.  Klinger v. Department of Corrections, 31 F.3d at 731.  Furthermore, at this stage, the Court determines that this alleged "difference in treatment bears no rational relation to any legitimate penal interest."  Phillips v. Norris, 320 F.3d 844, 848 (8th Cir. 2003).

Not only does Plaintiff adequately allege that Kneisel's actions had a discriminatory effect, but Pittman also sufficiently alleges that Kneisel had a discriminatory purpose.  The Court must read Plaintiff's Complaint as a whole "to determine whether each allegation, in isolation, is plausible."  Braden, 588 F.3d at 594.  Throughout Plaintiff's Complaint he alleges that the MSOP has a culture of institutional racism since at least 2005, and has been resistant to change.  (Am. Compl. ¶¶ 36-39 [Doc. No. 10].)  Additionally, Plaintiff alleges that several Security Counselors persistently

make racially charged death threats.  (Id. ¶ 25.)  And as the Court determined above, these alleged death threats and frequent racial slurs may amount to unconstitutional race discrimination.  Based on these allegations included in the Complaint, it is plausible that Kneisel affirmatively denied investigating Pittman's complaint in order to purposefully racially discriminate against Plaintiff.  While "[a]n inference pressed by the plaintiff is not plausible if the facts he points to are precisely the result one would expect from lawful conduct in which the defendant is known to have engaged," that is not the case here.  Braden, 588 F.3d at 597.  Assuming "snicker" is used in place of "nigger," the Court would expect that an MSOP Program Manager would investigate an inmate's claim alleging that a Security Counselor used this term.  Thus, Pittman's inference that Kneisel refused to investigate because he intentionally wanted to discriminate against Plaintiff states a plausible equal protection violation.

Defendants claim that Pittman failed to specifically allege that Kneisel had any discriminatory intent when refusing to discuss the name calling incident.  (Defs.' Obj. at 6 [Doc. No. 27].)  The Court disagrees.  Plaintiff describes the "snicker" incident and Kneisel's refusal to respond in the section of Plaintiff's Complaint entitled "Racial Discrimination."  (Am. Compl. ¶ 26 [Doc. No. 10].)  At the beginning of this section, Plaintiff prefaces his recitation of discriminatory incidents by stating that "Defendants have engaged in ongoing racial discrimination of Plaintiff."  (Id. ¶ 24.)  The Court reads these two paragraphs of Plaintiff's complaint in tandem to understand that Plaintiff alleges that Kneisel had discriminatory intent when he refused to investigate the "snicker" incident.  Therefore, the Court finds that reading Plaintiff's Complaint as a

whole, plausibly alleges that Kneisel chose not to investigate or address Pittman's

complaint "'because of,' not merely 'in spite of'" the adverse effect it would have on

Pittman.  See Feeney, 442 U.S. at 279.  Accordingly, the Court agrees with the magistrate

judge that Plaintiff stated a valid claim against Defendant Kneisel.

### 5.  Defendant Jesson

Defendants also object to Magistrate Judge Leung's findings concerning

Defendant Jesson.  (Defs.' Obj. at 6, 10 [Doc. No. 27].)  The magistrate judge determined

that Plaintiff stated a valid equal protection race discrimination claim against Jesson in

both her individual and official capacities.  (R & R at 15-21 [Doc. No. 24].)

Additionally, Magistrate Judge Leung determined that Pittman also stated an actionable

free exercise religious discrimination claim against Jesson, in her official capacity.  (Id. at

47.)

### a.  Equal Protection Claim

The Court first discusses Defendants' objection to the magistrate judge's finding

as it pertains to Pittman's equal protection claims, and then turns to Pittman's free

exercise claims.  Plaintiff alleges that Jesson, "in her individual and official capacity,

implemented, retained[,] and carried out [racially discriminatory] policies through MSOP

that violated the constitutional rights of Plaintiff."  (Am. Compl. ¶ 5 [Doc. No. 10].)

However, the Court finds that Plaintiff failed to state an equal protection claim against

Defendant Jesson, the Commissioner of the Minnesota DHS.  To survive a motion to

dismiss, Plaintiff must allege not only that an official policy promoting race

discrimination existed, but also that Jesson personally knew of and complied with this

policy.  Iqbal, 556 U.S. 662, 676 (2009).  As such, Plaintiff "must show an affirmative

link between the misconduct and the adoption of any *plan or policy* by the defendant

showing the authorization or approval of such conduct."  Semler v. Ludeman, No. 09-cv-

0732 (ADM/SRN), 2010 WL 145275, at *7 (D. Minn. Jan. 8, 2010) (emphasis added).

As to whether an official policy decision to racially discriminate existed,

Defendants contend that the Complaint contains "no plausible allegation of [Jesson's]

specific knowledge and complicity with a discriminatory policy."  (Defs.' Obj. at 7 [Doc.

No. 27].)  They argue that although Pittman alleges a "'culture of racism and

discrimination' from a 2006 audit, and refers to it as 'policy,' [] he is not specific about

the details of such a policy or how the Defendant supervisors instituted or created that

alleged policy in a generalized manner."  (Id. at 10.)  The Court agrees.  Plaintiff presents

no evidence demonstrating that the MSOP has an official policy of race discrimination.

Semler, 2010 WL 145275, at *7.  Pursuant to Jackson v. Nixon, a government official

may only be held liable for a concrete policy decision that is unconstitutional.  Jackson,

747 F.3d at 545 (finding that defendants with sufficient personal involvement could be

held liable for official policy decisions that required plaintiff to participate in religious

curriculum and programming).  Here, Plaintiff does not allege a formal policy decision

that condones race discrimination.  Thus, as the DHS Commissioner, Jesson cannot be

held responsible for a policy decision that was never made.

Furthermore, Jesson's statutory obligations over the MSOP are an insufficient

basis for the Court to hold her liable.  Jesson is responsible for "adopt[ing] rules to

govern the operation, maintenance, and licensure of secure treatment facilities operated

by the [MSOP]," and "establish[ing] an evaluation process to measure outcomes and behavioral changes as a result of treatment compared with incarceration without treatment, to determine the value, if any, of treatment in protecting the public."  Minn. Stat. Ann. § 246B.04.  According to <u>Jackson</u>, statutory duties may be sufficient to give rise to § 1983 liability when the state actors are those who truly administer the challenged program.  In <u>Jackson</u>, the Eighth Circuit held that the director of the Department of Corrections was liable under § 1983 because of his statutory responsibility to oversee the implementation of concrete uniform policies and procedures, enforce rules, and supervise employees.  <u>Jackson</u>, 747 F.3d at 544.  In contrast, here, DHS Commissioner Jesson is not personally involved with the implementation of a formal race discrimination policy. Therefore, the Court respectfully disagrees with Magistrate Judge Leung's finding that Plaintiff stated a valid equal protection claim against Defendant Jesson, in her individual or official capacity.  The Court accordingly grants Defendants' Motion to Dismiss Plaintiff's equal protection claim against Defendant Jesson.

### b.  Free Exercise Claim

Next, the Court evaluates the Plaintiff's free exercise claim against Jesson. Defendants object to the magistrate judge's finding that Pittman stated a valid free exercise claim against Jesson, in her official capacity.  The Court disagrees.

In order for Plaintiff to survive a motion to dismiss on his free exercise claim, he must allege that the MSOP rules Defendant Jesson implemented "placed a substantial burden on his ability to practice his religion."  <u>Patel v. U.S. Bureau of Prisons</u>, 515 F.3d 807, 813 (8th Cir. 2008).  Ultimately, to prove that the challenged MSOP policies and

rules substantially burden his ability to practice his religion, Plaintiff must establish that

the rules (1) "significantly inhibit or constrain conduct or expression that manifests some

central tenet of [his] individual religious beliefs;" (2) "meaningfully curtail [his] ability to

express adherence to [his] faith;" or (3) "deny [him] reasonable opportunities to engage

in those activities that are fundamental to [his] religion." Karsjens v. Jesson, _ F. Supp.

2d _, No. 11-cv-3659 (DWF/JJK), 2014 WL 667971, at *12 (D. Minn. Feb. 20, 2014)

(citing Patel, 515 F.3d at 813 (quoting Murphy v. Missouri Department of Corrections,

372 F.3d 979, 988 (8th Cir. 2004))).

The parties disagree about the standard the Court should use when evaluating

Pittman's free exercise claim. (Defs.' Mem. in Supp. at 27-28 [Doc. No. 17]; Pl.'s Opp'n

at 18-21 [Doc. No. 20].) Their disagreement stems from whether or how much the Court

should analogize this case to constitutional claims alleged by prison inmates. According

to the Supreme Court in Turner v. Safley, "when a prison regulation impinges on inmates'

constitutional rights, the regulation is valid if it is reasonably related to legitimate

penological interests." 482 U.S. 78, 89 (1987). In contrast, the Eighth Circuit held in

Senty-Haugen v. Goodno that although the "liberty interests [of individuals who are

civilly committed to state custody] are considerably less than those held by members of

free society," they are entitled to "more considerate treatment and conditions of

confinement" than prisoners. 462 F.3d 876, 886 (8th Cir. 2006). Accounting for these

principles, a court in this District applied a modified version of the Turner test to

determine if another MSOP policy was "reasonably related to legitimate institutional and

therapeutic interests." See Ivey v. Mooney, No. 05-cv-2666 (JRT/FLN), 2008 WL

4527792, at *5 (D. Minn. Sept. 30, 2008).

The parties' disagreement about which standard to use is irrelevant for the Court's decision on Defendants' Motion to Dismiss. The Court agrees with Magistrate Judge Leung that at this stage of litigation, it "need not determine under which standard – Turner, modified Turner, or something else – MSOP's policies will be evaluated." (R & R at 36 [Doc. No. 24].) Instead, the Court must only determine if Plaintiff has stated a claim for infringement of his religious freedom under the First Amendment. See Karsjens, 2014 WL 667971, at *12 (explaining that "regardless of whether the Turner standard or a modified Turner standard applies" the court can determine whether the plaintiff's allegations state an actionable constitutional claim).

Here, Plaintiff alleges that two MSOP rules, policy numbers 303.020 and 302.300, substantially interfere with his practice of his Muslim faith because the rules prevent him from wearing his Kufi at all times. (Am. Compl. ¶¶ 41-43 [Doc. No. 10].) Furthermore, Plaintiff also alleges that (1) he is "not allowed to bring his Koran out to the yard area of the MSOP facility where he lives," (2) "he cannot wear his prayer beads at all times," (3) "he cannot do his daily prayers in the MSOP yard area," and (4) "[he] is not allowed to have his praying oils in his room." (Id. ¶ 46.) Plaintiff contends that these are all "significant aspects" of his practice of Islam. (Id.) The Court reasonably presumes based on Pittman's Complaint that the MSOP rules and official policies prohibit Pittman from bringing his Koran into the yard, wearing his prayer beads at all times, doing his daily prayers in the MSOP yard, and keeping his prayer oils in his room. All of the challenged dress code and spiritual practice rules are affirmative policies that MSOP staff actively enforce, as opposed

to cultural and institutional attitudes that form the basis of Plaintiff's equal protection claim

against Defendant Jesson.

Regardless of whether the <u>Turner</u> standard or a modified <u>Turner</u> standard applies, the

Court concludes that Plaintiff has raised a plausible free exercise claim because he has

alleged that these MSOP rules substantially burden his religious practice. [8]  <u>See Patel</u>, 515

F.3d at 813.  In fact, this Court recently held similarly in a case involving a class action of

MSOP plaintiffs.  In that case, the plaintiffs did not even "identif[y] specific instances in

which any class member's sincerely held religious belief was infringed," but the Court still

held that reading the allegations in the plaintiff's complaint as a whole, the plaintiffs raised a

plausible free exercise claim.  <u>Karsjens</u>, 2014 WL 667971, at *12.  Here, Plaintiff has

identified several specific instances in which "significant aspects" of his religious

practice were infringed by MSOP policies.  (Am. Compl. ¶ 46 [Doc. No. 10].)

Given that Plaintiff states a plausible claim of religious discrimination, the Court

next addresses whether Defendant Jesson is an appropriate defendant for this claim.  As

explained above, in <u>Jackson</u>, the Eighth Circuit held the director of Department of

Corrections liable under § 1983 because of his statutory duty to oversee the

implementation of the official policies the plaintiff challenged.  <u>Jackson</u>, 747 F.3d at 544;

<u>Messimer v. Lockhart</u>, 702 F.2d 729, 732 (8th Cir. 1983).  Similarly, here, Jesson's

---

[8]     The Court notes that the United States Supreme Court will address a similar issue
in the 2014 term.  In <u>Holt v. Hobbs</u>, the Supreme Court will evaluate whether the
Arkansas Department of Corrections grooming policy, which prohibits petitioner from
growing a one-half-inch beard in accordance with his religious beliefs, violates the
Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq.
<u>See Holt v. Hobbs</u>, 509 F. App'x 561 (8th Cir. 2013) <u>cert. granted,</u> 134 S. Ct. 1490 (2014)
<u>cert. limited,</u> 134 S. Ct. 1512 (2014).

statutory duty to "adopt rules to govern the operation" of the MSOP, Minn. Stat. Ann. §
246B.04, are sufficient to hold her accountable for formal rules that allegedly infringe
upon Plaintiff's free exercise rights.  Thus, Defendants' objection to the magistrate
judge's R & R is overruled, and the Court finds that Pittman states a plausible free
exercise claim against Jesson, in her official capacity.

### 6.  Defendant Johnston

Defendants raise the same objections to the magistrate judge's R & R pertaining to
Defendant Johnston as they raised with respect to Defendant Jesson.

### a.  Equal Protection Claim

Again, the Court begins by addressing Pittman's equal protection claims against
Johnston, in her personal and official capacity.  To survive a motion to dismiss, Plaintiff
must allege that Johnston personally knew of and complied with a MSOP race
discrimination policy.  Iqbal, 556 U.S. 662, 676 (2009); Semler, 2010 WL 145275, at *7.
In order to state this claim, Plaintiff must first sufficiently plead that MSOP had such a
policy.  Defendants contend that Plaintiff fails to allege that Johnston had "specific
knowledge and complicity with a discriminatory policy."  (Defs.' Obj. at 7 [Doc. No.
27].)  The Court agrees.

Plaintiff's Complaint does not contain sufficient facts "to raise a reasonable
expectation that discovery will reveal evidence of [an official racially discriminatory policy
propagated by the MSOP]."  Twombly, 550 U.S. at 556.  Plaintiff alleges that "[t]he
MSOP's institutional racism has been documented and pointed out to the MSOP a number
of times" through a series of internal and external reports.  (Am. Compl. ¶¶ 37-39 [Doc. No.

10].)  For the purposes of Defendants' Motion to Dismiss, the Court accepts the allegations about these reports as true.  The Court also accepts as true Plaintiff's allegations about race discrimination that he has experienced as a patient at the MSOP.  Nonetheless, a failure to prevent these incidents or remedy the MSOP's institutional culture of racism is not equivalent to having a policy affirming discrimination.  Thus, Pittman did not plausibly allege "an affirmative link between the misconduct and the adoption of any plan or policy by the defendant showing the authorization or approval of such conduct."  Semler, 2010 WL 145275, at *7.  The Court finds that Plaintiff failed to allege that a racially discriminatory policy existed and therefore respectfully disagrees with Magistrate Judge Leung's finding that Plaintiff stated a valid equal protection claim against Defendant Johnston.  Defendants' Motion to Dismiss Plaintiff's equal protection claim against Defendant Johnston is therefore granted.

### b.  Free Exercise Claim

The Court now turns to Plaintiff's free exercise claim against Johnston, in her official capacity.  Using the same free exercise analysis as outlined above for Defendant Jesson, the Court concludes that Plaintiff has stated a plausible free exercise claim against Johnston.  To survive a motion to dismiss, Plaintiff must allege that the MSOP rules Defendant Johnston implemented "placed a 'substantial burden' on his ability to practice his religion," Patel, 515 F.3d at 813, and that Johnston is an appropriate defendant for this claim, Jackson, 747 F.3d at 544.

In his Complaint, Plaintiff alleges that several MSOP rules and policies substantially burden his practice of Islam.  (Am. Compl. ¶¶ 40-47 [Doc. No. 10].)  Unlike

the allegations of institutional racism that underpin Plaintiff's equal protection claim,

Plaintiff's free exercise claim is based upon actual MSOP policies and rules.  As noted

above, regardless of what standard the Court must ultimately use to evaluate the free

exercise claim, at this stage of the proceedings, Plaintiff has pled sufficient facts to

survive a motion to dismiss on this claim.  See Patel, 515 F.3d at 813; Karsjens, 2014 WL

667971, at *12.

As to whether Johnston is an appropriate defendant for this claim, her statutory

duty to oversee the MSOP is sufficient to give rise to her liability under § 1983.  As

Executive Director of the MSOP, Defendant Johnston, "is charged with overall

responsibility for the operation of the [MSOP]."  Minn. Stat. Ann. § 246B.01.

Furthermore, Johnston is charged with "establish[ing] a grievance policy and related

procedures that address and attempt to resolve civilly committed sex offender concerns

and complaints," which "must include procedures for assessing or investigating a civilly

committed sex offender's concerns or complaints."  Minn. Stat. § 246B.03, subd. 3(a).  If

Plaintiff is successful in proving his free exercise claims, Johnston's statutory duty to

administer the MSOP and make MSOP-wide policy decisions is sufficient to give rise to

§ 1983 liability under Jackson.  See Jackson, 747 F.3d at 544 (holding that inmate stated

actionable § 1983 claim against state director of corrections because of his statutory duty

to administer the challenged program); Messimer, 702 F.2d at 732.  Thus, Defendants'

objection to the magistrate judge's R & R is overruled, and the Court finds that Plaintiff

states a plausible free exercise claim against Johnston, in her official capacity.

### 7.  Defendant Moser

Defendants raise similar objections to the magistrate judge's findings about Defendant Moser as they did for Defendants Jesson and Johnston.

### a.  Equal Protection Claim

To state an equal protection claim against Moser, the MSOP Director, Plaintiff "must plead facts to show that [Moser] was directly involved in making, implementing, or enforcing a *policy* decision that created unconstitutional conditions." Jackson, 747 F.3d at 545 (emphasis added).  Defendants argue that Pittman did not allege that a "generalized discriminatory policy against African Americans at [the] MSOP [existed]." (Defs.' Obj. at 10 [Doc. No. 27].)  As noted in the equal protection claim discussions for Defendants Jesson and Johnston, the Court agrees.  Plaintiff failed to adequately allege that the MSOP had a policy condoning race discrimination.  Although the Court accepts Plaintiff's allegations that (1) the MSOP's culture fostered institutional racism, and (2) he suffered race discrimination at the hands of MSOP staff members, these facts do not substantiate a claim that the MSOP's official policy approved of race discrimination. Jackson, 747 F.3d at 545 (requiring plaintiff to allege a policy that creates unconstitutional conditions in order to state an actionable § 1983 claim); Semler, 2010 WL 145275, at *7 (same).  Therefore, the Court respectfully disagrees with Magistrate Judge Leung's finding and grants Defendants' Motion to Dismiss Plaintiff's equal protection claim against Defendant Moser.

### b.  Free Exercise Claim

Defendants also object to the magistrate judge's finding that Pittman stated a plausible free exercise claim against Moser, in his official capacity.  Applying the same

analysis as outlined above in the free exercise claim discussions for Defendants Jesson

and Johnston, the Court concludes that Plaintiff has stated a plausible free exercise claim

against Defendant Moser.  As with his First Amendment claim against Defendants Jesson

and Johnston, Pittman need only allege that the MSOP rules Defendant Moser

implemented "placed a 'substantial burden' on his ability to practice his religion."  <u>Patel</u>,

515 F.3d at 813.  Unlike the allegations of institutional racism that buttress Plaintiff's

equal protection claim, Plaintiff's free exercise claim is underpinned by actual MSOP

policies and rules.  (Am. Compl. ¶¶ 40-47 [Doc. No. 10].)

      Unlike DHS Commissioner Jesson and MSOP Executive Director Johnston,

Defendant Moser's responsibilities as Director of the MSOP are not detailed in the

MSOP's enabling statute.  Thus, Moser's statutory duties alone are insufficient to hold

Moser liable for Plaintiff's free exercise claim.  <u>See Jackson</u>, 747 F.3d at 544.  However,

"personal involvement may be assessed differently depending on the alleged

constitutional violation at issue."  <u>Id.</u> at 545.  In <u>Jackson</u>, the Eighth Circuit explained

that a prison warden's "general supervisory authority over prison operations does not

make him liable under § 1983."  <u>Id.</u>  In that case, the plaintiff had only made a conclusory

allegation that the warden should have known about the alleged First Amendment

violation, but he did not bolster that claim with any specific facts.  <u>See id.</u>  Thus, the court

held that the plaintiff failed to "plead facts that plausibly showed direct involvement by

the warden in the formation, implementation, or enforcement of [the discriminatory]

policy."  <u>Id.</u>

      In contrast, in this case, Plaintiff's allegation that Moser knew or should have

known about the MSOP rules that allegedly substantially burdened his religious practice

is not conclusory.  Rather, Plaintiff contends that as the Director of the MSOP, Moser

"created and implemented" these policies.  (Am. Compl. ¶ 47 [Doc. No. 10].)  The Court

finds that at this stage of the case, Pittman has pled sufficient facts to allege Moser's

direct involvement with the allegedly discriminatory policies.  See Melroy v. Bachmeier,

302 F.3d 845, 849 (8th Cir. 2002) (holding that "[t]he supervisor must know about the

conduct and facilitate it, approve it, condone it, or turn a blind eye [to it]" in order to be

held liable).  Therefore, the Court agrees with the magistrate judge and denies

Defendants' Motion to Dismiss Plaintiff's free exercise claim against Defendant Moser,

in his official capacity.

### C.  Plaintiff's Objections

Plaintiff also objects to the magistrate judge's R & R.  Specifically, Pittman

objects to Magistrate Judge Leung's determination that Pittman's race discrimination

claims against Defendants Snedker, Ninneman, and Rose should be dismissed.  (Pl.'s

Obj. at 4 [Doc. No. 26].)  Plaintiff also objects to Magistrate Judge Leung's

recommendation that Defendants Jesson, Johnson, and Moser are entitled to qualified

immunity in their individual capacities for Plaintiff's free exercise claims.  (Id. at 12-13.)

Below, the Court discusses Plaintiff's objections by discussing each defendant in turn.

### 1.  Defendant Snedker

Pittman objects to the magistrate judge's recommendation that his equal protection

claim against Defendant Snedker should be dismissed.  (Pl.'s Obj. at 11-12 [Doc. No.

26].)  Plaintiff alleges that Snedker is liable for race discrimination because of his failure

to intervene when a fellow Security Counselor said "What up snicker" to Plaintiff.  (Am. Compl. ¶ 26 [Doc. No. 10].)  As noted in the discussion about Defendant Kneisel, for the purposes of Defendants' Motion to Dismiss, the Court accepts as true Plaintiff's allegation that the term "snicker" was used as a racial slur.  (Id.)

As noted above, to survive a motion to dismiss, a complaint must contain facts with enough specificity "to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555; see Iqbal, 556 U.S. at 678.  In order to state an actionable equal protection claim against Snedker, Plaintiff must allege that he was treated differently from similarly situated persons of a different group.  Washington v. Davis, 426 U.S. 229, 238 (1976) (holding that an equal protection claim must prove discriminatory effect and purpose); Klinger v. Dep't of Corr., 31 F.3d 727, 731 (8th Cir. 1994).  Additionally, Plaintiff must allege that Snedker is personally liable because he misused his authority.  Jackson, 747 F.3d at 545; Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996); Ripson v. Alles, 21 F.3d 805, 808 (8th Cir. 1994).

As discussed above, the "snicker" name calling incident by itself does not rise to the level of actionable harassment claim.  See Blades v. Schuetzle, 302 F.3d 801, 805 (8th Cir. 2002); Burton v. Livingston, 791 F.2d 97, 99-100 (8th Cir. 1986).  Even assuming that Plaintiff could establish that the singular use of the term "snicker" constituted an actionable claim, Plaintiff failed to state an actionable claim against Snedker because he did not allege that Snedker had any supervisory authority.  In order to be liable for failing to intervene in the name calling incident, Snedker must have some "ability to help ameliorate the constitutional violation alleged" because of his supervisory

39

position.  See Jackson, 747 F.3d at 545 (finding that plaintiff sufficiently pled a First

Amendment claim against defendant because defendant's supervisory position and

authority permitted her to ameliorate the constitutional violation alleged); see Lomholt v.

Holder, 287 F.3d 683, 684 (8th Cir. 2002) (same).

Plaintiff contends that by failing to intervene or report the name calling incident,

Snedker implicitly encouraged the use of such language.  (Pl.s Obj. at 11 [Doc. No. 26].)

Furthermore, Plaintiff claims that by trying to convince Plaintiff that "snicker" was not a

racial slur, Snedker was "cover[ing] for the [S]ecurity [C]ounselor."  (Id.)  Even

accepting these allegations as true, Plaintiff has not alleged that Snedker "occupied any

sort of supervisory position" over the unnamed Security Counselor or had discriminatory

intent himself.  (R & R at 29 [Doc. No. 24].)  Therefore, the Court agrees with the

magistrate judge that Plaintiff failed to state a claim against Snedker.

## 2.  Defendant Ninneman

Pittman objects to the magistrate judge's recommendation that Pittman's claim of

race discrimination against Defendant Ninneman should be dismissed.  (R & R at 23

[Doc. No. 24].)  To survive a motion to dismiss, Plaintiff's Complaint must contain facts

with enough specificity demonstrating a plausible equal protection claim against

Ninneman.  Twombly, 550 U.S. at 555; see Iqbal, 556 U.S. at 678.  Similar to Plaintiff's

claim against Snedker, Plaintiff must allege that (1) Ninneman treated patients unequally

because of their race, Phillips v. Norris, 320 F.3d 844, 848 (8th Cir. 2003); (2) Ninneman

intentionally or purposefully discriminated, Lewis v. Jacks, 486 F.3d 1025, 1028 (8th Cir.

2007); and (3) Ninneman was personally or directly involved in the discrimination,

Ripson v. Alles, 21 F.3d 805, 808 (8th Cir. 1994).

Plaintiff alleges that Defendant Ninneman, the MSOP Behavioral Therapy Unit Supervisor, is liable for race discrimination, pursuant to the Fourteenth Amendment, because he failed to adequately respond to two reports of unequal treatment. (Am. Compl. ¶¶ 33-36 [Doc. No. 10].) The magistrate judge recommended dismissal, finding that (1) Ninneman did not directly participate in any of the allegedly racially motivated conduct, (2) his response to the alleged conduct was indicative of the seriousness in which he considered this alleged conduct, and (3) Plaintiff failed to allege facts showing that Ninneman was aware of a pervasive problem of racial discrimination at the MSOP. (R & R at 22-23 [Doc. No. 24].) In his Objections, Pittman contends that his Complaint alleges that Ninneman was "aware of the pervasive racial discrimination within [the] MSOP" and "failed to take any measures to rectify it." (Pl.'s Obj. at 9 [Doc. No. 26].) He further argues that he "only needs to plead facts alleging that [Ninneman] failed to adequately receive, investigate, or act upon complaints," which he contends he has pled. (Id. at 10.)

As to Ninneman's knowledge of pervasive race discrimination at the MSOP, Plaintiff fails to allege facts of that nature. Pittman only contends that Ninneman was aware of one patient repeatedly using the word "nigger," as well as Plaintiff's allegation that other patients were permitted to use discriminatory language without consequences. (Am. Compl. ¶¶ 33-34 [Doc. No. 10].) Even accepting these facts as true for the purposes of Defendants' Motion to Dismiss, the Court concludes that Plaintiff's Complaint does not contain facts with enough specificity alleging that Ninneman knew of

41

pervasive race discrimination at the MSOP.

In regard to the elements Pittman is required to plead, the Court finds that Pittman misstates the relevant standard and fails to adequately allege the three elements outlined above.  As an initial matter, Plaintiff does not allege that by responding to Plaintiff's client request forms, Ninneman treated Plaintiff differently than white patients who reported other patients' derogatory language.  Additionally, Plaintiff fails to allege that Ninneman intentionally or purposefully discriminated against him.  See Lewis, 486 F.3d at 1028.  Plaintiff asserts that Ninneman's responses to Plaintiff's reports of race discrimination were merely "canned answers that demonstrate complete disregard and indifference for [his] situation."  (Id. at 10.)  The Eighth Circuit explained in Braden that "[a]n inference pressed by the plaintiff is not plausible if the facts he points to are precisely the result one would expect from lawful conduct in which the defendant is known to have engaged."  Braden, 588 F.3d at 597.  Here, both of Ninneman's replies to Plaintiff's complaints appear to have been appropriate and responsive.  (Am. Compl. ¶¶ 33, 34 [Doc. No. 10].)  The content of Ninneman's responses is what one expects from a MSOP supervisor who seriously considers allegations of racially motivated conduct.  Braden, 588 F.3d at 597; (R &R at 23 [Doc. No. 24].)  Finally, Defendants correctly state that Pittman "does not allege actionable discriminatory conduct by anyone who Ninneman supervises, and does not allege any personal involvement in racial discrimination by Ninneman."  (Defs.'s Resp. at 4 [Doc. No. 29].)  Although Plaintiff alleges that patients continue to use racially-motivated derogatory language (Pl.'s Obj. at 6 [Doc. No. 26]), that is insufficient to overcome a motion to dismiss.  He must also

allege facts showing how Ninneman facilitated, approved, condoned, or turned a blind eye to the discriminatory conduct.  See Ripson, 21 F.3d at 809.  For all of these reasons, Defendants' Motion to Dismiss Plaintiff's claim against Defendant Ninneman is granted.

### 3.  Defendant Rose

Plaintiff also objects to the magistrate judge's ruling on his equal protection claims against Defendant Rose.  (Pl.'s Obj. at 9-11 [Doc. No. 26].)  Magistrate Judge Leung determined that Pittman failed to allege sufficient facts about Rose to survive a motion to dismiss.  (R & R at 21-21 [Doc. No. 24].)  The Court agrees with the magistrate judge's determination.

Plaintiff's Complaint does not contain facts with enough specificity alleging that Rose treated black and white patients unequally.  Again, Plaintiff must allege the three elements necessary to state a plausible equal protection claim.  First, Plaintiff must allege that Rose treated patients unequally because of their race, Phillips, 320 F.3d at 848; second, that Rose intentionally or purposefully discriminated, Lewis, 486 F.3d at 1028; and third, that Rose was personally or directly involved in the discrimination, Ripson, 21 F.3d at 808.  For the purposes of Defendants' Motion to Dismiss, the Court accepts Plaintiff's claims that (1) he complained to Rose about Unit 1-D Security Counselors permitting white patients to congregate but not black patients (Am. Compl. ¶ 31 [Doc. No. 10]), and (2) in response to Plaintiff's complaint about perceived unequal use of the BER disciplinary tool for black and white patients, Rose replied that "all patients are held to the same standards" (id. ¶ 30).  Nonetheless, these facts are insufficient to meet the requisite elements of an equal protection claim.

43

The Complaint does not include enough facts to substantiate a claim that Rose treated black and white patients differently or unequally.  Plaintiff's Complaint is silent as to whether Rose responded to his first report of unequal treatment on September 28, 2011.  (Am. Compl. ¶ 31 [Doc. No. 10].)  Thus, the Court cannot infer that Rose did or did not appropriately respond to Plaintiff's complaint that groups of white and black patients are treated differently.  Furthermore, Pittman alleges that Rose responded to Pittman's second complaint of unequal treatment by stating that "all patients are held to the same standards."  (Id. ¶ 30.)  Similar to Ninneman's replies to Plaintiff's complaints of unequal treatment, Rose's reply is consistent with what would be expected of an MSOP Counselor responding lawfully to a patient's allegation.   See Braden, 588 F.3d 585, 597 (8th Cir. 2009).

Since Plaintiff fails to allege that Rose treated black and white patients differently, he consequently cannot demonstrate that Rose intentionally or purposefully engaged in race discrimination.  See Lewis, 486 F.3d at 1028.

Finally, Pittman also fails to allege that Rose was directly involved in the discrimination.  Ripson, 21 F.3d at 808.  Plaintiff contends that he "only needs to plead facts alleging that [Rose] failed to adequately receive, investigate, or act upon complaints."  (Pl.'s Obj. at 10 [Doc. No. 26].)  The Court disagrees.  As the Eighth Circuit explained in Ripson, in order for a supervisor to be held liable for the acts of a subordinate, "[t]he supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see."  Ripson, 21 F.3d at 809 (citing Jones v. City of Chicago, 856 F.3d 985, 992 (7th Cir. 1988)).  The singular

response that Plaintiff alleges Rose made does not indicate that Rose facilitated, condoned, or turned a blind eye to the reported unequal treatment.  Therefore, the Court agrees with the magistrate judge that Pittman failed to state a claim against Rose.

### 4.  Defendant Jesson

Additionally, Plaintiff objects to the magistrate judge's recommendation that Defendant Jesson is entitled to qualified immunity, in her individual capacity, for Plaintiff's free exercise claims.  (Pl.'s Obj. at 1 [Doc. No. 26].)  Magistrate Judge Leung determined that DHS Commissioner Jesson was entitled to qualified immunity because Plaintiff's First Amendment rights that were allegedly violated were not clearly established.  (R & R at 46 [Doc. No. 24].)  Plaintiff objects, arguing that the R & R "improperly focuses on cases regarding religious rights in a prison setting and does not discuss the clearly established standard that restrictions of civilly committed person's rights must be reasonably related to legitimate security or therapeutic interests."  (Pl.'s Obj. at 13 [Doc. No. 26].)

"Under the doctrine of qualified immunity, a court must dismiss a complaint against a government official in [her] *individual capacity* that fails to state a claim for violation of 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Hager v. Arkansas Dep't of Health, 735 F.3d 1009, 1013 (8th Cir. 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)) (emphasis added).  The Court must consider (1) "whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right," and (2) "whether the right was clearly established at the time of the alleged infraction."  Hager, 735 F.3d at 1013-14.  If the

Court affirmatively answers both questions, then the official is not entitled to immunity.
Id.  The Eighth Circuit has held that a constitutional right is clearly established if "a
reasonable official would understand that what he is doing violates [the plaintiff's right]."
Janis v. Biesheuvel, 428 F.3d 795, 799 (8th Cir. 2005) (quoting Anderson v. Creighton,
483 U.S. 635, 640 (1987)).  The Court must grant qualified immunity to a government
official, in her individual capacity, if "immunity can be established on the face of the
complaint."  Bradford v. Huckabee, 330 F.3d 1038, 1041 (8th Cir. 2003).

      Of the two inquiries required for the Court's qualified immunity analysis, only one
is at issue here.  As noted, Pittman states a plausible free exercise claim against
Defendant Jesson.  Therefore, the only factor left for the Court to consider is whether
Plaintiff's free exercise rights were clearly established.  As noted above, in this case,
Pittman argues that Magistrate Judge Leung "focuse[d] on the wrong standard in finding
that [his free exercise right] was not clearly established."  (Pl.'s Obj. at 13 [Doc. No. 26].)
Specifically, Plaintiff contends that the magistrate judge mistakenly focused on prison
setting cases, and instead should have focused on cases pertaining to civilly committed
persons.  (Id.)  He argues that restrictions on prisoner's rights must only be "reasonably
related to legitimate penological interests."  Turner v. Safley, 482 U.S. 78, 89 (1987).
Whereas restrictions on the rights of civilly committed persons "must be reasonably
related to legitimate security or therapeutic interests."  (Pl.'s Obj. at 13 [Doc. No. 26])
(citing Ivey, 2008 WL 4527792 (applying the principles announced by the Eighth Circuit
in Senty-Haugen v. Goodno to craft a revised Turner standard)).

      Defendants respond to Pittman's objection by arguing that the R & R correctly

focused its attention on prison cases.  (Defs.' Resp. at 7 [Doc. No. 29].)  Defendants

contend that prison cases are instructive because of the similar institutional safety

concerns at play in the MSOP and in a prison setting.  (Id.)  The Court agrees.  The

Eighth Circuit recently held in Beaulieu v. Ludeman that "[a]lthough an involuntarily

committed patient of [the state] is not a prisoner per se, his confinement is subject to the

same safety and security concerns as that of a prisoner."  690 F.3d 1017, 1028 (8th Cir.

2012).  Therefore, the magistrate judge correctly stated that "cases involving prisoners

with allegations similar to Plaintiff's are instructive in determining whether the allegedly

infringed rights were clearly established."  (R & R at 41 [Doc. No. 24].)

Plaintiff argues that the R & R's analysis is further flawed.  The Eighth Circuit has

explained that "prison officials need only show that the regulated practice creates a

*potential* threat to institutional security."  Butler-Bey v. Frey, 811 F.2d 449, 451 (8th Cir.

1987) (emphasis original).  Plaintiff contends that Defendants have not demonstrated any

"therapeutic or institutional interest behind imposing restrictions on Plaintiff's religious

practice."  (Pl.'s Obj. at 13 [Doc. No. 26].)  Thus, he argues that the regulations are

inapposite to institutional safety or security.  At this stage of the proceedings, the Court

need not address whether such interests in fact exist.  Rather, the Court need only

determine whether, in a civil commitment setting, it is clearly established that Plaintiff is

entitled to the religious rights that he alleges.

Plaintiff alleges that under the polices promulgated by Defendant Jesson, he is not

allowed to (1) wear his Kufi at all times, (2) pray or study the Koran in the yard, (3) do

his daily prayers in the MSOP yard, (4) keep his prayer oils in his room, or (5) wear his

prayer beads at all times.  (Am. Compl. ¶¶ 40-47 [Doc. No. 10].)  Jesson in entitled to

qualified immunity if it is not clearly established that Plaintiff has a right to practice his

religion through the five means and methods listed above.  See Janis v. Biesheuvel, 428

F.3d 795, 799 (8th Cir. 2005).

The case law about each of these methods of religious practice indicates that a

civilly committed patient's rights are not clearly established.  First, it is not clearly

established that Pittman has a right to wear his Kufi at all times.  See Rogers v. Scurr,

676 F.2d 1211, 1216 (8th Cir. 1982) (holding that "no constitutional right of the prisoners

was violated by the prohibition on wearing prayer caps and robes outside religious

services"); Butler-Bey, 811 F.2d at 451 (upholding a prison regulation that prohibited

wearing "headgear in the prison visiting room, dining room, chapel, school, and

administration building" because of a concern over smuggling contraband); cf. Jihad v.

Fabian, No. 09-cv-1604 (SRN/LIB), 2011 WL 1641767, at *17 (D. Minn. May 2, 2011)

(citing Rogers and holding that a prison regulation limiting when plaintiff could wear his

Kufi did not substantially burden the plaintiff's religious exercise).  Second, it is not

clearly established that Plaintiff has a right to pray or study the Koran in the yard.  Weir

v. Nix, 114 F.3d 817, 822 (8th Cir. 1997) (holding that prison rule prohibiting plaintiff

from taking personal property, including a Bible, into the yard did not substantially

burden the inmate's practice of religion).

Third, it is not clearly established that Pittman has a right to complete his daily

prayers in the MSOP yard, outside of his cell.  See, e.g., Jihad, 2011 WL 1641767, at *4

(holding that regulation limiting where plaintiff could perform daily prayers was not

CASE 0:12-cv-01410-SRN-TNL   Document 31   Filed 09/30/14   Page 49 of 51

unconstitutional because "[t]o permit Muslim inmates to move around the facility, with greater access to public areas than that is given to other inmates, implicates institutional security and order"); Jihad v. Fabian, 680 F. Supp. 2d 1021, 1027 (D. Minn. 2010) (holding that "the safety of prison inmates and staff would be jeopardized by the increased movement of prisoners if inmates were allowed to leave their cells five times a day to pray"). Fourth, it is not clearly established that Plaintiff has a right to keep prayer oils in his room. Hodgson v. Fabian, No. 08-cv-5120 (JNE/SRN), 2009 WL 2972862, at *13 (D. Minn. Sept. 10, 2009) aff'd, 378 Fed. App'x 592 (8th Cir. 2010) (applying the standard required by the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), a more exacting standard than that required under the First Amendment, and holding that "[e]ven if Plaintiff had established that the prison's prayer oil policy substantially burdens his religion, limiting use of prayer oils to the chapel and prohibiting the use of oils in cells does not violate RLUIPA," because of safety and security concerns related to the oils). Fifth and finally, it is not clearly established that Pittman has a right to wear his prayer beads at all times. Charles v. Frank, 101 Fed. App'x. 634, 636 (7th Cir. 2004), cert. denied, 543 U.S. 980 (2004) (regulation prohibiting the wearing of visible prayer beads outside prison cell did not violate RLUIPA even though most Muslims would view the practice as essential to their faith).

Based on the preceding case law, the Court determines that Plaintiff's allegedly violated religious rights were not clearly established rights. Therefore, Magistrate Judge Leung correctly found that Plaintiff failed to state a religious discrimination against Jesson, in her individual capacity. Accordingly, the Court finds that Defendant Jesson is

49

entitled to qualified immunity, in her individual capacity.  See Hager v. Arkansas Dep't of Health, 735 F.3d 1009, 1013 (8th Cir. 2013).

Plaintiff essentially contends that to complete the qualified immunity analysis the Court must decide which standard – Turner, modified Turner, or something else – it will use to assess the merits of Plaintiff's free exercise claims.  As noted above, the Court need not resolve this issue at this time.  Moreover, simply because the Court finds the prison setting cases instructive does not suggest which standard the Court will use to assess the merits of Plaintiff's free exercise claims.  The fact that the case law is potentially unclear about which standard applies to the merits of Plaintiff's free exercise claim bolsters Defendants' argument that the law is not clearly established in this field.

### 5.  Defendant Johnston

Plaintiff also objects to the magistrate judge's recommendation that MSOP Executive Director Johnston is entitled to qualified immunity, in her individual capacity, for Plaintiff's religious discrimination claims.  (Pl.'s Obj. at 1 [Doc. No. 26].)  Applying precisely the same analysis as was applied for Defendant Jesson, the Court finds that Defendant Johnston is entitled to qualified immunity.  See Hager, 735 F.3d at 1013. Plaintiff's alleged religious rights are not clearly established.  Therefore, the Court agrees with Magistrate Judge Leung's determination that Johnston is entitled to qualified immunity in her individual capacity.

### 6.  Defendant Moser

Finally, Plaintiff objects to the magistrate judge's recommendation that Defendant Moser is also entitled to qualified immunity, in his individual capacity, for Plaintiff's

religious discrimination claims.  (Pl.'s Obj. at 1 [Doc. No. 26].)  The Court once again

applies the same analysis as it applied for Defendants Jesson and Johnston.  Based on the

aforementioned case law, Defendant Moser is also entitled to qualified immunity.  See

Hager, 735 F.3d at 1013.  The Court agrees with Magistrate Judge Leung's determination

that Moser is entitled to qualified immunity in his individual capacity because Plaintiff's

alleged religious rights are not clearly established.


**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  Plaintiff's Objections [Doc. No. 26] to the July 31, 2014 Report and
    Recommendation on Defendants' Motion to Dismiss [Doc. No. 15] are
    **OVERRULED**;

2.  Defendants' Objections [Doc. No. 27] to the July 31, 2014 Report and
    Recommendation on Defendants' Motion to Dismiss [Doc. No. 15] are
    **OVERRULED in part and SUSTAINED in part**;

3.  The Court **ADOPTS in part, and DECLINES to adopt in part**, the
    Magistrate Judge's Report and Recommendation [Doc. No. 24];

4.  Defendants' Motion to Dismiss [Doc. No. 15] is **GRANTED in part and
    DENIED in part**, as detailed herein;

    a.  Plaintiff's equal protection claims against Defendants Tom Snedker, Mike
        Furey, Rob Rose, Brian Ninneman, Lucinda Jesson, Nancy Johnston, and
        Kevin Moser are **DISMISSED WITH PREJUDICE**.

    b.  Plaintiff's free exercise claims against Defendants Lucinda Jesson, Nancy
        Johnston, and Kevin Moser, in their individual capacities, are **DISMISSED
        WITH PREJUDICE**.


Dated:  September 30, 2014                    s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge